Michael James **GIBSON**, Appellant,

v.

The **STATE** of Oklahoma, Appellee.

Harley Ed **DICKERSON**, Appellant,

v.

The **STATE** of Oklahoma, Appellee.

Nos. A–15415, A–15417.

Court of Criminal Appeals of Oklahoma.

Sept. 27, 1972.

892

O. A. Cargill, Jr., Stanley Pierce, Oklahoma City, Don Anderson, Public Defender, Oklahoma County, for appellants.

G. T. Blankenship, Atty. Gen., William M. Bonnell, Asst. Atty. Gen., for appellee.

## CONSOLIDATED DECISION

BRETT, Judge:

Appellants, Michael James Gibson and Harley Ed Dickerson, both of whom will hereafter be referred to as defendants as they appeared in the trial court, were tried conjointly for the crime of murder; the jury returned a verdict finding them guilty and assessed their punishment at death by electrocution. From that judgment and sentence separate appeals have been perfected to this Court.

Michael James Gibson was represented at his trial and on appeal by attorneys of his own choice, Mr. O. A. Cargill, Jr., and Mr. Stanley Pierce, both of Oklahoma City; Harley Ed Dickerson was represented by the Oklahoma County Public Defender, both at his trial and on appeal. The two appeals are herein consolidated. We modify and affirm the convictions.

The information alleged that on December 28, 1968, defendants went to the home of Mr. Wilbur R. Ward in Midwest City, Oklahoma, and shot him to death. The deceased's wife, Crystal Mae Ward, was also shot several times, but she survived and testified at this trial. Mrs. Ward related that she heard the doorbell ring and heard her husband go to the door; she heard a shot and went immediately into the living room where she saw Gibson with a gun advancing toward her retreating husband; Dickerson was standing inside the front door. She said that Gibson shot her husband once or twice and then shot her in the stomach; that Dickerson took the gun from Gibson and shot her twice more; next Dickerson shot her husband again in the temple and several times in the face. She related that Dickerson then took Mr. Ward's billfold, handed some object to Gibson, after which they both fled "real fast."

The State Medical Examiner, Dr. James Luke, performed an autopsy on the deceased body on the day Mr. Ward was killed. Dr. Luke related: he found bullet wounds in the left temple, lower left chest, left-hand with re-entry of the bullet into the abdomen, left-side, and left-buttocks; and he stated that of the five bullet tracts found in the body, any one or more of them could have caused the death.

David Bryan Ray, who was sixteen years old, was called by the state as a witness. Earlier, on the day he testified, the court granted him immunity against prosecution for anything he might testify to concerning any part he played in this "drama." He testified that about eleven o'clock P.M. on the night of December 28th, he went to Dickerson's house and saw the deceased's billfold and its contents; he related that he saw another boy, Gary Hogue, print the note at Dickerson's request, which was attached to the billfold and dropped in a mail deposit box. The note read: "Money is thicker than Blood. Thank you HA! HA!" Ray testified that later that night Gary Hogue drove him and Dickerson to the mail box at Brannon's Store on 29th street in Midwest City, and at Dickerson's direction he put the billfold in the mail box. The billfold and note were retrieved from the mail system by Mr. Morris W. Brown, a postal clerk. He identified the items retrieved from the United States Mail; and the state rested.

Other young persons who were at the Gibson home that night were: Patsy Gibson, Billy Ray Yarberry, Glenda Patterson, and Douglas Troxell. They all testified as witnesses for defendant Gibson and related substantially the same facts. Their testimony revealed Gibson returned home about eleven o'clock P.M., staggering and mumbling something about making magic, making the lamp move, and making people come out of the television. Gibson's mother also testified as a defense witness. She said that her son came home about five minutes after eleven o'clock P.M.; that he appeared to be drunk and unable to speak to her, that he possessed an offensive odor about his person, and that he did not leave the house again that night.

In an effort to establish the pattern of Gibson's actions, Roy Hendrix testified for Gibson and related that about six o'clock P.M. on December 28th, he was at Dickerson's house when both defendants were there trying to work on a motorcycle, but without success. He said that their coordination was poor because the two young men had been sniffing gold paint and drinking beer. He said he saw Dickerson consume two six-packs of beer.

Defendant Dickerson did not testify, but his co-defendant Gibson did testify in his own behalf. Gibson related he was eighteen years old; that since he was about fifteen years of age he had sniffed glue and gold paint; that recently he had commenced sniffing carbon tetrachloride; that he had also drunk beer with seconal and brandy, and had smoked marihuana; and, he described the effects each substance had on him. He said that on the afternoon of December 28th he was at Dickerson's house to help work on a motorcycle; that he started off on beer and gold paint, then brandy and "carbon-tet," and marihuana; he also related that he used some seconal. He testified that Dickerson was drinking beer with seconal and smoking marihuana. He remembered that Roy Hendrix came over to Dickerson's house, but could not relate the exact time of his arrival, nor the time he left. He testified that the last thing he could remember was getting into a car sometime late that evening. He said he could not remember returning home that night, nor having any conversation with his mother.

Defendant Gibson offered the testimony of a specialist in psychiatry and neurology, Dr. Sam Collins. Dr. Collins testified that he examined Gibson on three separate occasions, and related that in his opinion Gibson was incapable of premeditating any act on the night in question. He related also, that Gibson was unable to recall anything that happened that night. A hypothetical question was posed for the doctor, premised upon the earlier testimony of both defendant Gibson and his witness, Roy Hendrix, concerning the use of drugs of the kind and in the quantity testified to by the witnesses, and whether or not the user would know and understand what he was doing under the drug influence. Dr. Collins gave his opinion that a person under the influence of those drugs would not know what he was doing.

A second doctor, who was to testify for the defense, was unavailable because he was in surgery at the time, so the defense was granted permission to offer his testimony later, out of turn. However, this witness did not testify.

The state offered as rebuttal testimony that of Dr. Lorraine Smith, a psychiatrist at Central State Hospital; Gary Hogue, who hand-printed the note attached to the billfold; Charles Dale Bates, who related portions of certain conversations he had with Defendant Gibson, after the crime was committed; and the earlier witness, David Bryan Ray, was recalled. Ray testified further concerning the note and billfold. He related, over defendant's objections, that Dickerson taped the note to the billfold, and that Gibson held the billfold while it was being taped. Ray testified further, over defendants' objections, that Gibson related, "He said, well—he said he walked up to the door and rang the doorbell, and when he answered, when Mr. Ward answered the door, Mike said Hi, and then he shot him." In an effort to

weaken this witness' testimony, the defense showed that Ray was on probation from a criminal conviction at the time he testified.

Gary Hogue admitted that he printed the note which was attached to the billfold; and that he heard Gibson relate that he shot Ward in the stomach first. When the prosecution asked what Defendant Gibson's condition was, the witness, answered, "Normal." Defendant's objection to the answer was overruled. On cross-examination, the defense showed that Hogue was presently under bond on a pending charge; and the witness admitted that he knew defendant Gibson sniffed glue, "All the time."

Charles Bates testified to a purported conversation with Gibson, after the crime was committed, when he said Gibson indirectly admitted his part in the crime. Dr. Lorraine Smith was the last rebuttal witness offered. The crux of her testimony came in answer to the question, ". . . did Michael Gibson relate to you any facts of any part that he played in this murder of Mr. Wilber Ward?" Dr. Smith answered, "He did. He did." Vigorous objections were offered to the testimony of Dr. Smith relating to her testifying to anything Defendant Gibson related to her. This objection was primarily premised on the fact that her testimony violated the physician-patient relationship. The trial court denied defendants' objections and their motion for mis-trial on the grounds that her testimony was, as the court stated, ". . . highly relevant to the issues involved, and particularly Dr. Collins' testimony as well as that of the defendant Gibson. . . ." Dr. Lorraine Smith, being a psychiatrist at the Central State Hospital had examined Gibson, when he was committed there under court order; she also testified that in her opinion Gibson was sane. She testified further, with reference to one who had been sniffing paint, smoking marihuana and drinking beer from about noon until eleven o'clock P.M., "I think if an individual were taking these throughout the day, and if he were in a state of exhilaration or the high as an ef-

fect of it, it wouldn't impair his knowing right from wrong." Over objection of the defendants, Dr. Smith gave her opinion that Gibson was aware of what he was doing at the time the crime was committed.

At the conclusion of Dr. Smith's testimony, the state rested its case. Defendant Gibson moved for a mis-trial because no proper foundation was laid for such rebuttal testimony, and that it was highly prejudicial. The motion for mis-trial was denied and both defendants rested their case. When the court's instructions were being settled, Defendant Gibson offered three requested instructions and Defendant Dickerson offered two instructions. Counsel for Gibson offered argument, which was concurred in by Defendant Dickerson's counsel, for his third requested instruction, distinguishing between voluntary intoxication and involuntary intoxication resulting from constant use of intoxicants, which he argued, extenuates the crime from murder to manslaughter because of the incapability to formulate the necessary intent required. Counsel further complained that the court's instructions did not sufficiently cover the statutory requirements of homicide. The state offered no instructions, and both defendants renewed all their special motions and demurrers. Thereafter, the court instructed the jury and closing arguments were heard.

During the district attorney's closing argument, numerous objections were entered by counsel for both defendants, all of which were overruled by the trial court. At the conclusion of the arguments, both defendants again moved for a mis-trial, which was denied. The jury retired at 8:55 P.M. to consider its verdict, and at 11:55 P.M. the jury returned its verdict, finding both defendants guilty of the charge of murder; and the jury assessed the death penalty for both defendants. The jury was polled and each member thereof answered that such was his verdict. Imposition of judgment and sentence was set to be had on May 29, 1969, at nine o'clock A.M.

## I.

The first proposition raised by both defendants complains that the selection of the jury was not in accordance with the statutory provision contained in 22 O.S. 1961, § 660; and that the proper test was not used in determining the qualifications of prospective jurors to serve on defendants' jury. Numerous cases are cited in support of these propositions, but the main reliance appears to rest upon the United States Supreme Court's decision in Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776. Okla. Title 22 O.S. 1961, § 660, pertaining to juror challenges for implied bias and as applicable herein, provides in part:

"A challenge for implied bias may be taken for all or any of the following cases, and for no other:

\*  \*  \*  \*  \*  \*

8. If the offense be punishable with death, the entertaining of such conscientious opinions as would preclude his finding the defendant guilty of, in which case he shall neither be permitted nor compelled to serve as a juror."

In his brief, Gibson asserts that ten veniremen were successfully challenged for cause by reason of their attitude against the death penalty. Both defendants assert that the limitations of the statute concern only the juror's incapability to arrive at a *verdict of guilty*, because the maximum penalty for the charge of murder is that of death; and that the error lays in the trial court's application of an erroneous test and permitting the challenge for cause because the prospective jurors stated they could not impose the death sentence. As we review the record, defendants' contentions are not well founded.

This Court considered this same question in Koonce v. State, Okl.Cr., 456 P.2d 549 (1969). That decision cites the United States Supreme Court decision in Boulden v. Holman, 394 U.S. 478, 89 S.Ct. 1138, 22 L.Ed.2d 433 (1969), which referred to the Supreme Court's earlier Witherspoon decision and stated the following:

" 'The most that can be demanded of a venireman in this regard,' we said, 'is that he be willing to consider all of the penalties provided by state law, and that he not be irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings. \* \* \*' We made it clear that '[u]nless a venireman states unambiguously that he would automatically vote against the imposition of capital punishment no matter what the trial might reveal, it simply cannot be assumed that that is his position.' "

Considering the position of the first three prospective jurors who were challenged for cause, Mr. Dennis B. Clark, Mr. Luther A. Avey, and Mr. W. G. Coffey, the record reflects that the three men raised their hand when the prosecutor made his first inquiry concerning the range of punishment in this case, i. e., life imprisonment or the death penalty, indicating that they could not consider the death penalty. At that time the prosecutor challenged the three jurors for cause, without proceeding further. The trial judge conducted further inquiry outside the hearing of the other jurors, as follows:

BY THE COURT: Mr. Clark, and Mr. Coffey, I'll ask you if you mean by your answer that you could not consider, *under any conceivable set of circumstances, the full range of punishment* provided by the laws of the State of Oklahoma? Mr. Coffey?

[Mr. Coffey]: I could not. Death, I couldn't sentence anybody to death.

BY THE COURT: Regardless of what the facts or circumstances or evidence showed, is that correct?

[Mr. Coffey]: I don't believe I could.

BY THE COURT: All right. Mr. Avey?

[Mr. Avey]: I couldn't either.

BY THE COURT: Then your answer is the same as Mr. Coffey's?

[Mr. Avey]: Yes, sir.

BY THE COURT: All right. Mr. Clark?

[Mr. Clark]: My answer is the same. (Emphasis added.)

Counsel for Gibson inquired of the jurors concerning whether or not they could assess life imprisonment; to which all three stated they could assess the lesser of the two penalties. Counsel for Dickerson inquired if the three men could consider the evidence and arrive at a verdict, excluding the question of punishment, to which they each stated they could.

The next juror excused for cause by the state was Mrs. R. E. Edwards, who indicated she could not vote for the death penalty. Both defense counsel inquired whether or not she could reach a verdict and possibly assess life imprisonment, to which she said she could. The court then inquired:

BY THE COURT: Mrs. Edwards, are you telling the Court that *you could not consider* the death penalty in any case under any circumstances?

[Mrs. Edwards]: That's right. (Emphasis added.)

The court overruled defendants' objections and the juror was excused for cause.

The fifth juror excused for cause was Mrs. Bernice Dreadfullwater. After making general inquiry of her concerning the parties involved in the trial, the court asked:

BY THE COURT: Do you know of any reason at all why you could not serve as a fair and impartial juror in this case, Mrs. Dreadfullwater?

[Mrs. Dreadfullwater]: Well, I don't believe in capital punishment.

BY THE COURT: You know of any reason why you could not serve as a fair and impartial juror in determining whether or not the defendants are guilty, based upon the evidence presented in open Court?

[Mrs. Dreadfullwater]: No, sir.

\* \* \* \* \* \*

BY MR. HARRIS: Regardless of what the evidence may be in this case, *could you consider the death penalty?*

[Mrs. Dreadfullwater]: No.

\* \* \* \* \* \*

BY MR. HARRIS: *You would not consider the death penalty* under any circumstances?

[Mrs. Dreadfullwater]: No, sir. (Emphasis added.)

Defense counsel inquired of this juror concerning her willingness to follow the law in the assessment of punishment, to which she stated she could. Counsel for Dickerson inquired concerning whether or not she could reach a verdict, to which she said she could. However, the juror's answer was couched with the reservation limiting her assessment of punishment to life imprisonment. Before sustaining the state's challenge for cause, the court inquired further:

BY THE COURT: Are you telling the Court that *you could not consider the full range of punishment* provided by the laws of the State of Oklahoma, you could not consider, for example, assessing death under any circumstances?

[Mrs. Dreadfullwater]: Yes, sir. (Emphasis added.)

Mrs. P. L. Johnson was the sixth of the ten jurors challenged for cause. In answer to the district attorney's question: "And after the state meets this burden and shows to you beyond a reasonable doubt, in a proper case would you therefore consider the death penalty?" Mrs. Johnson answered, "I don't think so." Later the court made further inquiry concerning whether or not this juror could consider the full range of punishment provided by the laws of the State of Oklahoma; she answered, "I have a strong question about whether I could do that." The Judge asked further, "You don't know, is that correct?" The juror said, "I don't know."

Mrs. E. Carmichael stated to the court's inquiry, "I do not believe in capital punish-

ment." While Mrs. Carmichael stated that she could be a fair and impartial juror, and could reach a verdict based upon the evidence presented, she also stated in answer to the court's inquiry that she could not consider the full range of punishment in assessing punishment based on the evidence.

Mr. Charles R. Martin stated he could serve as a fair and impartial juror in reaching a verdict, but under no circumstances could he consider the death penalty. Mr. O. A. Williams likewise clearly stated that he could not consider the death penalty in assessing punishment. The tenth juror challenged for cause was Mrs. Mary K. Homberg, who like the nine other jurors clearly stated that she could not consider the death penalty. However, this juror also stated that she could serve as a fair and impartial juror in reaching a verdict, but she could not consider the full range of punishment established by the State of Oklahoma.

The record clearly reflects that the district attorney's question was always couched in language, "could the juror consider the death penalty?" The trial judge likewise clearly inquired whether or not the prospective juror was willing *to consider* the full range of punishment authorized by law.

We observe the United States Supreme Court said in Witherspoon v. Illinois, supra, that veniremen cannot be excluded for cause, ". . . Simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." This statement was explained in note 21, at page 522, 391 U.S., at page 1777, 88 S.Ct., at page 785, 20 L.Ed.2d, as follows:

" . . . The most that can be demanded of a venireman in this regard is that he be willing to *consider* all of the penalties provided by state law, and that he not be irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in

the course of the proceedings. . . ." (Emphasis in original.)

As we view the record of voir dire, the ten veniremen were challenged because they could not consider the full range of punishment provided by state statute, regardless of the facts presented. This question was most pointedly presented by the trial judge, before he sustained the state's challenge for cause.

■ With reference to the argument of both defendants, which restricts the meaning of 22 O.S.1961, § 660(8), that the intention of that section applies only to the venireman's inability to reach a verdict finding the defendant guilty, as cause for challenge is incorrect. In those cases, wherein the information alleges murder, the punishment to be assessed by the jury is part of the verdict. 21 O.S.1961, § 707, provides:

"Every person convicted of murder shall suffer death, or imprisonment at hard labor in the State penitentiary for life, at the discretion of the jury. Upon trial of an indictment for murder, the jury, if they find the defendant guilty, must designate in their verdict whether he shall be punished by death or imprisonment for life at hard labor, and the judgment of the court shall be in accordance therewith. But upon a plea of guilty the court shall determine the same."

■ We therefore reach the same conclusion we arrived at in Koonce v. State, supra, that the jurors were not excused solely because they did not believe in capital punishment; instead, they were excused because they could not consider the full range of punishment provided by law. We therefore deny Gibson's first proposition and Dickerson's first and second proposition.

II.

Defendant Gibson's second proposition complains of the trial court's failure to give his requested instructions to the jury, while defendant Dickerson's third proposition complains that error was committed when

the court failed to instruct the jury on the elements of manslaughter. These propositions will be discussed together.

The court's instruction number five instructed the jury on the definition of homicide as defined in 21 O.S.1961, § 701, but no instruction was given on the lesser offense of manslaughter; also, the eighth instruction provided: "Homicide committed with a design to effect death is not the less murder because the perpetrator was in a state of anger or voluntary intoxication at the time." None of the court's instructions made any further reference to the question of intoxication as it may be related to the element of intent in premeditated murder. It appears to be the position of both defendants that the trial court should have more fully instructed the jury concerning their defense offered at the trial. While none of the requested instructions offered by either defendant can be considered "model instructions," they did offer their theory of defense; and Defendant Gibson's second and third requested instructions were on the offense of first degree manslaughter.

There can be no doubt whatsoever that the defense of both defendants was that of intoxication by use of drugs, i. e., sniffing glue, sniffing paint, drinking beer while taking seconal, and smoking marijuana. Such being true, it appears to follow that the question of fact should have been offered for the jury to decide, i. e.: "Were the defendants intoxicated to the extent they could not formulate the intent or premeditation required in the proof of the crime of Murder?" As we view the trial court's instructions, that question was not allowed to go to the jury for consideration; nor was the jury given any choice other than murder in deciding the defendants' fate.

■■ "In the trial of a charge of murder, it is the duty of the court to determine, as a matter of law, whether there is any evidence tending to reduce the crime to the lower degrees of homicide, and, if so, to instruct the jury to fix the degree in

their verdict." Smith v. State, 59 Okl.Cr. 111, 115, 56 P.2d 923, 925 (1936). Likewise, if there is any substantial evidence that the crime charged may have been committed under circumstances which would reduce it from murder to manslaughter, it is the duty of the court to so instruct whether requested by the defendant or not. "In fact, we have gone so far as to hold in such situations the trial courts should give the defendant the benefit of any doubt which the evidence may suggest, and instruct the jury on the law of each degree which the evidence tends to prove, whether requested or not it is the trial court's duty so to do." Tarter v. State, Okl.Cr., 359 P.2d 596, 601.

■ We are of the opinion the trial court stopped short of the law in these cases, when the jury instruction number eight, encompassing 21 O.S.1961, § 153, was given with no further instruction. The rule was established by this Court in the early case of Beshirs v. State, 14 Okl.Cr. 578, 584, 174 P. 577, 579 (1918), which stated:

"A person who commits a homicide while so drunk [intoxicated] as to be incapable of forming a premeditated design to kill, if he had formed no purpose to commit the crime prior to the time he became so intoxicated, is not guilty of murder, but is guilty of manslaughter in the first degree."

In the case of Oxendine v. State, 335 P. 2d 940 (1958), a conviction for homicide was appealed and reversed by this Court, in which this Court provided an instruction to be used, if there is evidence of intoxication, as follows:

"You are instructed that homicide committed with a design to effect death is not the less murder because the perpetrator was in a state of voluntary intoxication at the time. However, one of the elements of the crime of murder is an intent to effect the death of the person killed and if you find that the defendant at the time of the killing was so completely drunk [intoxicated] as to be totally unable to form an intent to kill, or

if you have a reasonable doubt thereof, you should not find the defendant guilty of murder. The homicide, under such circumstances, unless otherwise excusable, would amount to manslaughter in the first degree."

■ We must therefore conclude, under the facts of this case, that the trial court committed error in failing to instruct the jury on the lesser offense of first degree manslaughter. Even one of the state's rebuttal witnesses testified on cross-examination that Defendant Gibson sniffed glue "all the time." The vexatious aspect of the intoxication in this case lies in its source, i. e., intoxication by use of drugs. Nonetheless, the condition explained by the expert witnesses was compared to intoxication by other recognized and presumably acceptable means. The Attorney General argues that the crime would be murder, regardless of intoxication, because of subsection 2 of Title 21, § 701, "When perpetrated by any act imminently dangerous to others and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual." Had the jury been instructed on the question of intoxication, such argument might be meritorious; but under the state of this record we cannot accept this argument.

■ Nonetheless, we do not consider the trial court's error sufficient—under the facts of this trial—to constitute reversible error. The proof was sufficient to show that these defendants did commit homicide. We therefore deny both defendants' complaints with reference to the instructions, as being sufficient to cause reversal of these convictions.

### III.

■ Defendant Gibson's third proposition asserts error was committed when his motion for severance was denied. Both defendants filed motions for severance and recited the reason justifying severance to be that there was a conflict of interest between the two defendants. In support of his proposition, Gibson relies upon the authority of the trial court to grant a severance, found in 22 O.S.1961, § 838. However, that section places the granting, or denial, of the motion clearly within the discretion of the trial court.

The Attorney General argues that section 838 was repealed by implication when the legislature enacted 22 O.S.Supp., 1968, §§ 436–440; however, we do not accept that argument. In his reply brief, Gibson refers to section 439, and reminds this Court that it, like section 838, authorizes a severance when it appears that either the defendant or the state is prejudiced by the joinder for trial. We agree, but it has long been the rule of this Court that matters left to the discretion of the trial court will not be reviewed unless there is a showing of abuse of that discretion. In these appeals there is not sufficient showing of such abuse of discretion to effect the outcome of the trial.

### IV.

The fourth and last propositions in both defendants' briefs complain of the closing argument of the district attorney. The record reflects that on numerous occasions counsel for Defendant Gibson objected to the prosecutor's argument, and on several occasions moved for a mistrial; and counsel for Defendant Dickerson moved for a mistrial once during the argument. Dickerson states in his brief that counsel for Gibson may have invited the district attorney's comments from the Bible, but he did not; and he reminds this Court that severance would have prevented such conflict from happening. While this is true, it is nonetheless insufficient to justify either the severance, or the mistrial.

■ In view of the trial court's instructions to the jury, the extensive recitation of Mosaic law, and quotations from the New Testament, were unnecessary and served only appeal to the individual religious prejudices of the respective jurors. If this were a close case, this type of closing argument may well serve to tip the balance, justifying a reversal; but in these

appeals, such complaint is not sufficient to accomplish that result.

 Even more significant than the religious quotations in the closing arguments of the prosecution, are the numerous undue references made by the prosecution to the court's eighth instruction; "Homicide committed with a design to effect death is not the less murder because the perpetrator was in a state of anger or voluntary intoxication at the time." Both prosecutors discussed and placed undue emphasis on that instruction which, as hereinbefore discussed, stopped short of fully stating the law concerning intoxication as a mitigating factor to reduce the crime to manslaughter. "It has often been held by this court that it is unnecessary for the court, in a murder case, to give an instruction submitting the question of manslaughter in the first or second degree, where that issue is not raised by the evidence." Tucker v. State, 66 Okl.Cr. 335, 341, 92 P.2d 595, 598 (1939). In the instant trial, however, the basis of Defendant Gibson's evidence, and the only defense offered by him, was that of intoxication; and as we view the evidence, it was sufficient to require the manslaughter instruction premised upon the question of intoxication. The emphasis of both prosecutors on instruction eight, absent the additional mitigating instruction referred to in Oxendine v. State, supra, denied the defendants that due process of law contained in both the United States and the Oklahoma Constitutions.

We are therefore of the opinion, for the foregoing reasons, that the sentence imposed on the defendants at their joint trial for murder must be modified. In view of the testimony and evidence offered there is little doubt that both defendants would again sustain a conviction if they were subjected to a second trial on the same testimony. However, because the question of "possible mitigation" was not offered to the trial jury, we believe the proper administration of justice requires that the sentence of both defendants be modified from death by electrocution, to life imprison-

ment; and as modified, the judgments and sentences should be, and the same are therefore, affirmed.

BUSSEY, P. J., concurs in result.

SIMMS, J., concurs.