Michael Edward LONG, Appellant,

v.

STATE of Oklahoma, Appellee.

No. F–87–923.

Court of Criminal Appeals of Oklahoma.

Sept. 14, 1994.

**170**

Terry J. Hull, Asst. Appellate Public Defender, Norman, for appellant.

Robert H. Henry, Atty. Gen., Steven Spears Kerr, Asst. Atty. Gen., Oklahoma City, for appellee.

## OPINION ON REHEARING

LANE, Judge:

Michael Edward Long, Appellant, was tried by jury and convicted of two counts of Murder in the First Degree. (21 O.S.1981,

§ 701.7) in Muskogee County District Court, Case No. CRF–87–161. The jury recommended the death penalty and the trial court sentenced the appellant to death for each count. In this perfected appeal the appellant challenges the admission of his confession, photographic evidence and statements of the victim; statements of the prosecutor made during closing argument in the second stage of trial; and second-stage jury instructions. We find no error warranting reversal or modification and affirm the judgment and sentence.

Michael Edward Long, Appellant, met Sheryl Graber when they worked together at a florist in Muskogee. He was strongly attracted to her sexually; she was uninterested in him. Armed with a 10 inch knife with a locking blade and .22 caliber pistol, Long drove to Graber's home on the evening of April 7, 1987 to demand sex from her. He parked some distance from her house.

Graber let him into her home, and when she rebuffed him he forced her to the floor. He stabbed her when she screamed. Graber managed to get to her front door, open it and yell for help. The appellant yanked her back inside and shut the door. When the neighbors ran to the home, the appellant opened the door just wide enough to tell them everything was alright; that Graber was just drunk. He then continued the attack. He stabbed Graber thirty one (31) times, twice breaking off pieces of his knife blade in her body, and shot her in the head and abdomen. He shot her four year old son, Andrew, twice at point blank range and stabbed him. The neighbors called the police who came and arrested Long who tried to flee from the house.

## ISSUES PERTAINING TO THE ADMISSION OF EVIDENCE

In his first proposition of error the appellant argues his confession was inadmissible because it was involuntary. Appellant challenges two facets of voluntariness. First, he argues he was deceived by the investigator into believing the investigator was "on his side". Secondly, he argues the police did not

scrupulously honor his right to remain silent. If these allegations are true, the confession was involuntary and should have been suppressed. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975).

The trial court conducted a *Jackson v. Denno* hearing to determine whether the appellant's confession was voluntary. *See* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). At this hearing the defendant testified, and the State incorporated the testimony of the interrogating officers from the preliminary hearing.

Appellant testified he was read his rights from a card, and then told the police officer he did not understand them. Later at the Muskogee Police Department he was given a Waiver of Rights form which he read, understood and signed. The interrogating officer again explained his rights to him. The appellant testified he still did not understand his rights, but he did not tell this to the officer.

■ At the preliminary hearing Investigator Gary Sturm testified that when Appellant's confession was taken he introduced himself as an investigator for the District Attorney. He read Appellant his *Miranda* rights and gave him a Waiver of Rights form which the appellant read and signed. He testified the appellant stated he understood his rights. He also testified a uniformed policeman was present during the interrogation which was held at the Muskogee Police Station. Under these circumstances, we do not believe the appellant was misled into believing Investigator Sturm was "on his side". *See Cartwright v. State,* 695 P.2d 548, 551 (Okl.Cr.1985).

■ We must next determine whether the appellant invoked his right to silence. At the suppression hearing appellant was asked by his defense counsel whether during his interview with the police, in response to a question, he stated:

"I really don't want to answer this question. Why do you want to know?"

He affirmed he had responded in this way. During the same hearing defense counsel also asked the appellant:

Q: Why did you not tell them you wanted to stop?

A: Because Mr. Sturm wanted me to keep going, and I couldn't figure out why he was asking me so many questions.

Appellant argues his statement was an assertion of his right to silence which was ignored by the investigating officer in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Appellant takes the position that when he stated, "I really don't want to answer that.", all questioning should have ceased. "Why do you want to know?", the question he asked immediately thereafter, should, according to the appellant's argument, be given no effect. In support of this position appellant directs the Court to *Miranda,* Id.; *Smith v. Illinois,* 469 U.S. 91, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984); and *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975).

*Miranda* provides the starting point for analysis:

> If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At that point, he has shown that he intends to exercise his Fifth Amendment privilege ...

384 U.S. at 473–74, 86 S.Ct. at 1627–28.

When the appellant stated, "I really don't want to answer that.", he asserted his Fifth Amendment privilege of silence. At this point, under *Miranda* the police were obliged to cease questioning. The uncontroverted facts of this case establish the police did immediately cease questioning. It was not until the appellant asked, "Why do you want to know?", that questioning continued. Compare, *Smith v. Illinois,* 469 U.S. 91, 105 S.Ct. 490. Given these facts, the dispositive issue is whether the appellant could reinitiate questioning, and whether in fact he did.

Waiver after assertion of a Fifth Amendment right has been most fully addressed in the context of the closely related Fifth Amendment right to counsel. We find the

analysis persuasive, and adopt it for determination of the often interrelated issue of waiver of the Fifth Amendment right to silence.

As the United States Supreme Court explained in *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) a person who asserts the Fifth Amendment right to counsel:

> is not subject to further interrogation by the authorities until counsel has been made available to him, **unless the accused himself initiates further communication, exchanges, or conversations with the police.** 451 U.S., at 484–485, 101 S.Ct., at 1884–1885 (footnote omitted) (emphasis added).

Two years later in *Oregon v. Bradshaw*, 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983) the Court put forth a two-stage analysis for use in determining whether the accused waived this Fifth Amendment right after having asserted it. Under *Bradshaw*, if an accused speaks to police after asserting the Fifth Amendment right, the statement must be examined to determine whether it "initiates further conversation". 462 U.S. at 1045–46, 103 S.Ct. at 2835. If it does, it must then be examined further to determine whether it evinces a "willingness and a desire for a generalized discussion about the investigation". Id. Each prong must be satisfied in order to find an accused waived the right to counsel after having asserted it.

*Bradshaw* presents a somewhat different case than the one before us, for some unknown period of time elapsed between the assertion of the right to counsel, and initiation of further communication by the accused. *See*, 462 U.S. at 1042, 103 S.Ct. at 2833. We do not find this distinction to place appellant's case outside the reach of *Bradshaw*.

Applying the *Bradshaw* analysis to the case before us, we find the appellant both initiated further conversation with the police and indicated a willingness and desire for further discussion about the investigation when he asked, "Why do you want to know?". In so doing, Appellant waived his previously asserted right to silence. We therefore turn to the final question in the analysis: whether the purported waiver was knowing and voluntary.

■ At the suppression hearing the following facts were developed. The appellant had been given the *Miranda* warnings prior to being questioned. He had achieved grades of "A" and "B" during two years of college, and he understood the *Miranda* warnings. He signed a waiver of rights, and spoke with the police. Questioning ceased when the appellant stated he did not want to answer a question. However, immediately after stating he did not ·want to answer a question the appellant initiated further communication with the investigator without any threat, promise, or other impropriety on the part of the police. These facts are sufficient to carry the State's burden to prove by a preponderance the waiver was knowing and voluntary. *See Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). The trial court properly denied appellant's motion to suppress.

In his next proposition of error the appellant argues the State failed to provide him with written notice of the evidence to be used in the second stage proceeding as required by *Wilson v. State*, 756 P.2d 1240 (Okl.Cr. 1988). The State concedes no notice was given as required by 21 O.S.1981, § 701.10. However, the State argues this omission was both harmless, since the prosecutor cooperated fully with defense counsel, and waived under *Green v. State*, 713 P.2d 1032 (Okl.Cr. 1985), *cert. denied*, 479 U.S. 870, 107 S.Ct. 241, 93 L.Ed.2d 165 (1986). The State is correct in both instances.

■ When we examine this issue in the context of trial it is clear defense counsel was fully prepared to deal with this evidence. The problem of trial by ambush did not arise in this case. The appellant has waived this allegation by failing to raise it at trial. *See Green v. State* at 1038; *Standridge v. State*, 701 P.2d 761 (Okl.Cr.1985); *Cartwright v. State*, 695 P.2d 548 (Okl.Cr.1985).

In his next proposition of error the appellant argues the admission of irrelevant, unfairly prejudicial and inflammatory evidence denied him a fair trial. These assertions can only be addressed in the context of the

crimes charged. The murders produced gashed and bloody bodies, bloody clothes and a bloody crime scene. The State may, within the scope of the rules of evidence present this reality to the jury.

■ Appellant first challenges the admission of four color photographs of the bloody bodies of Sheryl and Andrew Graber. As we explained in *Thomas v. State*, 811 P.2d 1337, 1345 (Okl.Cr.1991) this Court has long held the admission of pictures of a deceased are relevant to establish *corpus delicti*, to illustrate the injuries sustained by the victim, to corroborate expert testimony and to establish intent. The pictures were no more gruesome than necessary and were admissible for all the listed purposes.

■ Appellant objected at trial to the introduction of photographs of a bloody paper bag, and blood droplets. We fail to see how this evidence is relevant to any trial issue. We agree with the appellant that these photographs should not have been admitted. Given the admissible evidence, however, we can say with certainty that these photographs did not contribute to the verdict. This error is harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

■ Appellant also objected to the introduction of bloody clothes removed from the victims. The clothes showed the stab wounds as well as the distance from which the victims were shot. They corroborated the testimony of the OSBI ballistics expert. We do not agree these had no probative value, or that the probative value was outweighed by the prejudicial effect. These were properly admitted. This result is not inconsistent with our holding in *K.S.B. v. State*, 829 P.2d 685 (Okl.Cr.1992) in which we found bloody clothes should have been excluded where they were not relevant, and had a noticeable and offensive odor.

■ Appellant next argues the admission, during the first stage of trial and over defense objection, of pieces of flesh gouged from the body of Sheryl Graber were improperly admitted. Unfortunately, the State offers us no guidance for it failed to respond to this argument. In order to be admissible

the probative value of relevant evidence must outweigh its prejudicial effect. 12 O.S.1981, § 2403. While this evidence was corroborative of first stage testimony, we believe this minimally probative value was greatly outweighed by its prejudicial effect. The pieces of flesh should not have been admitted at trial. However, given all the admissible evidence, we find this error is harmless beyond a reasonable doubt. *See Chapman, supra.*

■ The State introduced in the first stage of trial and over defense objection, hearsay statements of Sheryl Graber through her friend, Barbara Robertson. Robertson testified Graber told her "Whatever you do don't leave me alone with him". She also told Robertson she was afraid of the appellant. These statements are admissible under 12 O.S.1981, § 2803(3) to show Graber's state of mind. *See Williamson v. State*, 812 P.2d 384 (Okl.Cr.1991); *Lamb v. State*, 767 P.2d 887 (Okl.Cr.1988); *Moore v. State*, 761 P.2d 866 (Okl.Cr.1988).

■ During the second stage of trial the State introduced twenty-three color photographs of the bloody crime scene and the victims. Although appellant argues these photos were not relevant to any second-stage issue, this plainly is not so. The State bore the burden in the second stage of trial to prove Sheryl Graber suffered serious physical abuse. The gash on her neck, the multiple stab wounds, the pieces of flesh cut from her body all support this aggravating circumstance. We agree with the appellant that pictures of Andrew Graber's toy spaceman was not relevant to any trial issue and should have been excluded. However, given all the evidence presented at trial, this evidence did not contribute to the sentence, and is therefore harmless. *See, Chapman, supra.*

■ During rebuttal in the second-stage of trial the State called Stephen Lee, the therapist who was appointed by the court to determine whether the appellant was competent to stand trial. The State examined Mr. Lee, and the appellant extensively cross-examined him. Through cross-examination appellant elicited mitigating evidence regarding his social relationship problems. Appellant now objects for the first time to the admis-

sion of Mr. Lee's testimony. His failure to object at trial has waived all but fundamental error. *Jones v. State*, 781 P.2d 326 (Okl.Cr. 1989). This is an issue of first impression.

The statutory language of 22 O.S.Supp. 1985, § 1175.4(D) is plain and clear:

No statement, admission or confession made by the person whose competency is in question obtained during his examination for competency may be used for any purpose except for proceedings under this act. No such statement ... may be used against such person in any criminal action ... directly, indirectly or in any manner or form, except that if such person is found to be competent at the time of his examination hearing, any such statement made by him may be used for purposes of impeachment.

It is equally clear that the appellant's statements were used both directly and indirectly during the second stage of trial and not for purposes of impeachment. The State used responses the appellant made to questions posed during a personality test to show future dangerousness. The defense on extensive cross-examination used the appellant's statements indirectly to present mitigating evidence.

Appellant relies on *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981) to argue his Fifth and Sixth Amendment rights were violated by the State's use of this testimony. In *Estelle v. Smith*, as in the present case, the defendant did not make a contemporaneous objection to the use of evidence obtained during a competency hearing. The Court held the statements could not be used absent a knowing and voluntary waiver of the Fifth Amendment right to silence and the Sixth Amendment right to counsel. 451 U.S. at 469–72, 101 S.Ct. at 1876–77. The present case differs from *Estelle v. Smith* in an important way. In the present case the appellant not only did not object to Mr. Lee's testimony, the defense cross-examined Mr. Lee extensively to bring out evidence which could be used in mitigation. By this act we find appellant affirmatively, voluntarily and knowingly waived his Fifth and Sixth Amendment rights which might otherwise bar the use of evidence obtained in the competency hearing.

## ISSUES PERTAINING TO SECOND-STAGE JURY INSTRUCTIONS

■ Appellant next challenges the jury instruction in the second stage of trial which defined the aggravating circumstance "especially heinous, atrocious, or cruel". The instruction given in this case limited the application of this aggravator by stating the "phrase especially heinous, atrocious, or cruel is directed to those crimes where the death of the victim was preceded by torture or serious physical abuse." Appellant argues the words "directed to" do not sufficiently channel the jury's discretion. We are not persuaded by this semantic argument. The language channeled the jury's discretion to that specific class of murders which may justify the death penalty. See *Williamson v. State*, 812 P.2d 384 (Okl.Cr.1991); *Thomas v. State*, 811 P.2d 1337 (Okl.Cr.1991); *Nuckols v. State*, 805 P.2d 672 (Okl.Cr.1991); *Foster v. State*, 779 P.2d 591 (Okl.Cr.1989); *Stouffer v. State*, 742 P.2d 562 (Okl.Cr.1987).

Appellant next focuses on the limiting language found sufficient in *Stouffer v. State*, 742 P.2d 562 (Okl.Cr.1987), that the aggravator, heinous, atrocious and cruel be applied only to cases of torture or serious physical abuse. Appellant makes a well reasoned argument that this language is insufficient to limit the jury's discretion. We have consistently rejected this argument, however, and reject it here. See *Thomas*, 811 P.2d at 1349; *Foster*, 779 P.2d at 592–94. Appellant raises a related issue in his Reply Brief. He argues that he committed the crimes almost four months prior to publication of *Stouffer v. State*, 742 P.2d 562 (Okl.Cr.1987) in which the Court limited the application of "heinous, atrocious or cruel" to those cases where death was preceded by torture or serious physical abuse. Appellant argues *Stouffer* cannot be applied to him because it "constitutes the retroactive application of an unforeseeable judicial enlargement of a criminal statute which substantively alters the essential elements and facts necessary to establish guilt of the aggravating circumstance." This argument fails for the simple reason *Stouf-*

*fer* by no means enlarged a criminal statute. In fact it narrowed the application of the statute significantly.

■ Continuing in the same vein, the Appellant argues serious physical abuse alone will not support a finding that the murder was especially heinous, atrocious or cruel, and that the evidence was insufficient to show Sheryl Graber was tortured prior to death. This argument is fundamentally flawed. This Court has consistently found either torture or serious physical abuse alone will support this aggravating circumstance. *See Foster, supra; Thomas, supra.*

■ In this case the evidence established the appellant stabbed Sheryl Graber 31 times, gouged pieces of her flesh from her body, broke his knife blade twice in her body and shot her once in the upper abdomen and once in the head. This is sufficient for any rational trier of fact to find the appellant inflicted serious physical abuse on Sheryl Graber.

■ Assuming his arguments to be persuasive thus far, the appellant next argues his death sentence must be vacated because the aggravating circumstance that the murder was especially heinous, atrocious and cruel is unconstitutional and was considered by the jury when it imposed the death sentence. We have already rejected appellant's argument of unconstitutionality. We also point out that even if this aggravator had been found to be unconstitutional, or unsupported by the facts of this case, this Court may reweigh the aggravating and mitigating evidence and resentence where we can find the use of the invalidated aggravator was harmless beyond a reasonable doubt. *See Sellers v. State,* 809 P.2d 676 (Okl.Cr.1991); *Cartwright v. State,* 778 P.2d 479 (Okl.Cr.1989). We do not reach the issue of reweighing, however, because we do not invalidate any of the aggravating factors.

■ Appellant next challenges the burden of proof which the trial court instructed the jury it must use in the second stage of trial. He argues the jury should have been instructed that the aggravating circumstances must outweigh the mitigating circumstances beyond a reasonable doubt. This argument was rejected in *Johnson v. State,* 731 P.2d 993 (Okl.Cr.1987) and we again reject it. Weighing is a balancing process which need not be proved by a reasonable doubt.

Appellant next challenges the so called "anti-sympathy" instructions. Appellant argues this instruction allowed the jury to disregard the evidence offered in mitigation. This Court has fully considered this argument and rejected it. *See Banks v. State,* 810 P.2d 1286 (Okl.Cr.1990).

■ The trial court used the Oklahoma Uniform Jury Instruction—Criminal, OUJI–CR 440, to instruct the jury on weighing the aggravating circumstances against the mitigating evidence. Appellant argues this instruction is confusing and incomprehensible. This Court has rejected this argument numerous times, finding no further instruction to be necessary. *See, Fox v. State,* 779 P.2d 562 (Okl.Cr.1989); *Smith v. State,* 737 P.2d 1206 (Okl.Cr.1987), *cert. denied* 484 U.S. 959, 108 S.Ct. 358, 98 L.Ed.2d 383; *Walker v. State,* 723 P.2d 273 (Okl.Cr.1986), *cert. denied* 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 600; *Foster v. State,* 714 P.2d 1031 (Okl.Cr. 1986), *cert. denied* 479 U.S. 873, 107 S.Ct. 249, 93 L.Ed.2d 173.

■ Using OUJI–441 the trial correctly instructed the jury it did not have to write down the mitigating evidence, if any, that it found. Appellant argues, without case citation, that this prevents meaningful appellate review of the jury's weighing of mitigating and aggravating evidence. Appellant's brief is thorough and well written. Experienced appellate counsel is well aware that the failure to cite authority waives all but fundamental error. *See Brewer v. City of Tulsa,* 811 P.2d 604 (Okl.Cr.1991); *Hiler v. State,* 796 P.2d 346 (Okl.Cr.1990); *Guy v. State,* 778 P.2d 470 (Okl.Cr.1989). We therefore address this issue as to fundamental error only.

The United States Supreme Court made clear in *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983) that in a state where the jury is to weigh mitigating evidence against evidence of aggravating circumstances the federal constitution does not

require a State to adopt specific standards for "instructing the jury in its consideration of aggravating and mitigating circumstances ...". 462 U.S. at 891, 103 S.Ct. at 2750. The Oklahoma Legislature to date has not imposed such standards. Where no standards for the analysis of mitigating evidence is imposed, and the legislature has imposed none, we fail to see the authority for appellate review by this Court of the analysis used by the jury in weighing mitigating evidence. We find no fundamental error here.

■ Appellant continues his linguistic challenge to the jury instructions by arguing Instruction 8 which defined mitigating circumstances confused the jury. This argument was expressly rejected in *Thomas v. State*, 811 P.2d 1337 (Okl.Cr.1991). In *Thomas* we explained the United States Supreme Court has established a standard of review to be applied in capital cases where the appellant alleges jury instructions are subject to various interpretations, at least one of which would result in a constitutionally infirm verdict. That standard, announced in *Boyde v. California*, 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence. *Id.* 494 U.S. at 380, 110 S.Ct. at 1198. We have examined the challenged instruction and find there is no reasonable likelihood the jury failed to consider the evidence offered in mitigation properly.

■ Appellant next argues the trial court gave the jury contradictory instructions regarding the use of evidence presented in the first stage of trial. The prosecutor incorporated all the evidence from the first stage into the second stage of trial. Instruction 12 told the jury it was to consider only the evidence received in open court in the second stage of the proceeding. The trial court also verbally said to the jury:

Ladies and Gentlemen of the jury, the agreement with the attorneys and the stipulation was that the evidence that was presented in the first stage and the second stage would all be considered during this stage of the proceeding. Is that correct?

Defense Counsel: That's correct your honor.

We do not agree with the appellant that the oral statement by the trial judge conflicted with the written instruction which was received without objection. The jury was limited in its consideration to matters presented in open court. We find no error here.

■ Appellant's next argument is predicated on the belief we agreed with his assertion that the jury was barred from considering first stage evidence in the second stage of trial. Having rejected that argument, we do not find, as appellant argues, that the State failed to present sufficient evidence to prove the appellant created great risk of death to more than one person, or that the appellant killed Graber's four-year old son to avoid lawful arrest or prosecution. The evidence presented in the first stage, incorporated into the second stage, and on which the jury was adequately instructed supports the finding by the jury of these two aggravating circumstances.

■ In his final challenge to the second-stage jury instructions the appellant asserts the trial court erred by refusing to instruct the jury on the lesser-included offense of second-degree depraved mind murder. We disagree with appellant's conclusion that the evidence raised a question whether he acted with a premeditated intent to kill. The uncontroverted evidence is that after repeated conversations which frightened Sheryl Graber the appellant armed himself with a pistol and 10″ knife with a locking blade; he drove to her home and parked some distance away; he began to stab her immediately when she rebuffed his demands for sex; he pulled her back into the house when she got to the door to call for help; and he shot her twice at close range. He also shot her son at close range, as he confessed, to eliminate a witness. We find the evidence did not support the requested instruction.

## PROSECUTORIAL MISCONDUCT IN SECOND STAGE

■ Appellant next challenges two instances of alleged prosecutorial misconduct.

During the second stage closing argument the prosecutor acknowledged the appellant's parents' pleas for mercy for their son. He then asked the jury to consider:

> whether the same pleas that they made for Michael Long would not have been made if they had been there by Mr. and Mrs. Rigler for the life of their daughter.

Appellant calls this an improper comment on facts not in evidence, citing *McCarty v. State,* 765 P.2d 1215 (Okl.Cr.1988). In *McCarty,* the prosecutor asked the jury during first stage closing argument, "I wonder if [appellant] was grinning and laughing that night when he murdered [the victim]". *Id.* at 1220. These two comments are categorically different. In the present case the prosecutor is not injecting facts not in evidence. Rather he is putting the evidence in the context of the human tragedy which is necessarily a part of the trial. We find these remarks to be within the bounds of fair comment.

■ Appellant further objects to the following statement made by the prosecutor in second stage closing argument:

> "Accept the testimony of Ann and Arlie that they love their son. But here the rule of law applies. And the rule of law, and the evidence, and the testimony, and the Instructions, and the photographs, and the other evidence that you have demands, cries out for the justice that this case demands, and that is the death penalty."

Again, we find this to be within the bounds of fair comment. Appellant's reliance on *McCarty* is misplaced. In *McCarty, supra,* we condemned the prosecutor's personal expression of guilt and repeated demands for justice, which he defined as the return of a death sentence. The prosecutor's comment here presents a different situation entirely.

■ The prosecutor closed his second stage argument with the following Biblical reference:

> Whosoever shall harm one of these little ones who believeth in me, it is better that a millstone be hanged about his neck, and he be drowned in the depth of the ocean.

Although defense counsel did not object to the statement at trial, we will address appellant's challenge on appeal. This kind of rhet-

oric has no place in a criminal trial in the State of Oklahoma. *Gibson v. State,* 501 P.2d 891, 900–01 (Okl.Cr.1972). Criminal procedure goes to extreme lengths to remove all possibility of a jury verdict or sentence even partially based on bias or prejudice. We call on jurors to perform the difficult task in a capital murder trial of deciding whether another human being lives or dies. For the prosecutor to attempt to make this task somehow easier by implying God is on the side of a death sentence is an intolerable self-serving perversion of Christian faith as well as the criminal law of this State. We agree with the appellant; this statement is rank misconduct which we expect not to be repeated. *See Gibson, Id.*

■ Whether it amounts to reversible error is another question. If this statement influenced the jury in recommending a sentence of death for the murder of Andrew Graber, the sentence must be vacated and the matter remanded for resentencing. If on the other hand we conclude beyond a reasonable doubt that the statement did not improperly influence the sentencing decision, the error is harmless. *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

The evidence is undisputed that the appellant murdered this boy by shooting him twice and stabbing him. The evidence is also undisputed that he murdered the boy in order to avoid arrest and prosecution. Given the strong evidence against the appellant, we find beyond a reasonable doubt that the prosecutor's improper appeal to religious bias in the jurors was harmless. *See Gibson, supra.*

## MANDATORY SENTENCE REVIEW

Pursuant to 21 O.S.Supp.1985, § 701.13(C), this Court must determine two issues in all capital cases:

1. Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; and

2. Whether the evidence supports the jury's finding of a statutory aggravating cir-

cumstance as enumerated in Section 701 of Title 21.

■ Appellant argues his death sentence is the product of arbitrary factors injected by the errors and alleged errors discussed in this case. However, the errors which we found to be harmless are insufficient to yield an arbitrary sentence. From a review of the entire record we can say with certainty the jury was not influenced by passion, prejudice, or any other arbitrary factor contrary to Section 701.13(C)(1).

■ When we review the aggravating circumstances, we find the jury found in the case of the murder of Sheryl Graber that the murder was especially heinous, atrocious and cruel and the appellant created a great risk of death to more than one person. The jury found the murder of Andrew Graber was committed for the purpose of preventing a lawful arrest or prosecution. 21 O.S.1981, § 701.12(2)(4) and (5). Each of these aggravating circumstances is well supported by the evidence.

The judgment and sentence for each count of Murder in the First Degree is **AFFIRMED.**

STRUBHAR, J., concurs.

LUMPKIN, P.J., concurs in result.

JOHNSON, V.P.J., specially concurs.

CHAPEL, J., dissents.

LUMPKIN, Presiding Judge, concurring in results.

I concur in the results reached by the Court. However, I cannot join with the Court in the propositions of law which it attributes to *K.S.B. v. State*, 829 P.2d 685 (Okl.Cr.1992), and *Gibson v. State*, 501 P.2d 891, 900–01 (Okl.Cr.1972). I further would limit the discussion of Appellant's complaints of the provisions of Oklahoma Uniform Jury Instructions–Criminal, 440 and 441, to the fact the Oklahoma procedure for weighing aggravating circumstances against the mitigating evidence is constitutional under both the United States and Oklahoma Constitutions and the allegation is without merit.

JOHNSON, Vice Presiding Judge, specially concurring.

I specially concur in the opinion written by the majority herein but need to point out some differences that I see as it relates to the U.S. Supreme Court case of *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d, 359 (1981).

The majority in the opinion indicates that *Estelle* stands for the proposition that where a therapist, appointed by the court to determine competency, goes beyond such testimony and testifies to the ultimate issue of threat to society, then Fifth and Sixth Amendment rights of the defendant would be violated. I agree with this general statement. I think *Estelle* goes further and requires the defendant to affirmative waive prior to the competency examination, his/her Fifth or Sixth Amendment rights. In this particular case, the appellant did not make such an affirmative waiver.

Appellant did not, through counsel, object to Mr. Lee's testimony and, therefore, waived all but fundamental error. *Jones v. State*, 781 P.2d 326 (Okl.Cr.1989). This, due to the violation of the Fifth and Sixth Amendment constitutional right, would be fundamental error and before the court could make a finding of harmless error, this must be done by the court's finding of harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

I would find that based upon the clear evidence and further based upon the fact that defense counsel contributed to this error by extensive cross examination and used a part of the cross-examination for mitigation and therefore assisted in a waiver. I find the evidence compelling and that *Chapman* is satisfied and that this was harmless beyond a reasonable doubt.

The Supreme Court noted that the doctor in *Estelle v. Smith*, supra, turned from his initial requirement, that is, to make a finding of competency for trial to be "an agent of the state recounting unwarranted statements made in a post-arrest custodial setting." *Id.* 451 U.S. at p. 467, 101 S.Ct. at p. 1875.

CHAPEL, Judge, dissenting.

Late on the night of April 7, 1987, following the horrifying murders of Sheryl Graber and her young son, Andy, three law enforcement officials questioned Long about his involvement in these tragic events. Detective Sturm, who was conducting the interrogation, and Detective Lauderdale, who was present during the interrogation, testified at preliminary hearing and again at trial about what transpired. After Mr. Sturm obtained some background information from Long, he began questioning Long about the murders. At this point, in the words of Detective Sturm, Long said something to the effect of, "I don't want to ... Why are you asking those questions?" P.Hrg.Tr. 123–24. In response to being asked whether he wanted to talk to them, Detective Lauderdale recalled Long as having said, "I really would rather not...." P.Hrg.Tr. 145. On more than two occasions, Long asked why Mr. Sturm was asking those questions, and why it was so important that he talk to the detectives.

Long testified at the August 19, 1987, hearing on his motion to suppress the statements which he had given during the April 7, 1987, interrogation. During that hearing, defense counsel asked Long why he had continued to ask the detectives questions rather than keep silent:

Q. All right. At any point during this interrogation, in response to questions by Mr. Sturm, did you reply, and I'm going to paraphrase here, 'I really don't want to answer this question. Why do you want to know?'

A. Yes.

Q. Why did you make that response?

A. Because I wanted to stop, and I didn't understand why they were asking me so many questions if they was [sic] trying to help me.

Q. You were under the impression they were trying to help you?

A. Yes.

Q. Why is that?

A. I thought Mr. Sturm was an attorney for my side.

* * * * * *

Q. Now, you stated that, I believe you have, that you wanted to stop?

A. Yes.

Q. Why did you not tell them that you wanted to stop?

A. Because Mr. Sturm wanted me to keep going and I couldn't figure out why he was asking so many questions.

Q. Any other reason?

A. No.

Q. When you told them that you didn't really want to talk and you asked him, 'Why do you want to know?' what was Mr. Sturm's response to that question?

A. He said, 'Why don't you want to answer these questions? Do you have something to hide?'

Q. Did he say anything else to you?

* * * * * *

A. I believe he said he wanted to hear my side of the story.

* * * * * *

Q. All right. Did you tell Mr. Sturm that you—other than the statement that we've already talked about, did you tell Mr. Sturm that you didn't want to continue talking?

A. I believe I did; yes.

Q. How many times did you tell him?

A. I think two.

Q. Why did you not stop talking?

A. Because Mr. Sturm wanted me to keep going, and I thought that if I stopped I might have made him angry and brought trouble on myself.

M.Tr. 31–35.

In its initial opinion, the majority reviewed this testimony and found that Long did not clearly assert and thus did not effectively invoke his Fifth Amendment privilege. On rehearing, the Court recognizes Long sufficiently invoked his right to silence, but concludes he then waived it by asking "Why do you want to know?" According to the majority, Long's question "initiated further conversation with the police and indicated a willingness and desire for further discussion about the investigation...." *Majority* at 172. I agree that Long invoked his right to silence,

but cannot conclude that his question "Why do you want to know?" subsequently waived it. I would therefore hold that Long's April 7, 1987, statements to police were improperly admitted against him.

An accused's own confession has a "profound impact on the jury ..." and "is probably the most probative and damaging evidence that can be admitted against him...." *Arizona v. Fulminante*, 499 U.S. 279, 294–96, 111 S.Ct. 1246, 1257, 113 L.Ed.2d 302 (1991). While Long's confession was unconstitutionally obtained and thus improperly admitted against him at trial, I find that the overwhelming evidence of guilt rendered its effect on his convictions harmless. *See Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). *Compare Booker v. State*, 851 P.2d 544, 547 (Okl.Cr.1993) (admission of confession obtained in violation of Fifth Amendment right to counsel held not harmless).

I cannot, however, reach the same conclusion with regard to the **sentence of death** Long received for the murder of Andy Graber. In his statement to the police, Long told Detective Sturm that he shot Andy Graber "so there would not be any witnesses." Tr. II 607. Long's improperly obtained statement was presented during second stage proceedings **as the only supporting evidence** of the aggravating circumstance that the murder was committed "to avoid lawful arrest or prosecution." The prosecutor emphasized to the jury that this evidence **came from Long's own lips.**

The fact that Long killed to avoid lawful arrest or prosecution was the only aggravating circumstance of Andy Graber's murder which the jury found. I must conclude that Long's jury relied solely on his inadmissible statements when determining the existence of this aggravator. Accordingly, I would reverse Long's sentence of death for the murder of Andy Graber.

For different reasons, I would also reverse Long's sentence of death for the murder of Sheryl Graber. In my opinion, the jury could have been under the influence of passion and prejudice when it imposed the death sentence for her murder. *See* 21 O.S.Supp. 1985, § 701.13(C)(1) and (2). Specifically, I find that Long's improperly admitted responses to a pretrial psychological examination, coupled with the first stage introduction of human flesh and the prosecutor's reference to the Bible during second stage closing argument, **could have formed** the basis for the jury's determination that the aggravating circumstances outweighed the mitigating evidence.

During the first stage of the trial, Mr. Stephen Lee testified at length concerning Long's written responses to questions posed during a psychological examination conducted to determine Long's competency to stand trial. Particularly damaging was the following exchange, during the first stage of trial, between the prosecution and Mr. Lee:

Q. On question 71, Mr. Lee, 'I think a great many people exaggerate their misfortunes in order to gain the sympathy and help of others.' Question, 71, how did Mr. Long answer that question?

A. Number 71 was answered true.

Q. Number 93, 'I think most people would lie to get ahead.' How did Mr. Long answer 93?

A. True.

Q. Question 97, 'At times I have the strong urge to do something harmful or shocking.' How did Mr. Long answer that question?

A. True.

Q. Question 277, 'At times I've been so entertained by the cleverness of a crook that I hoped that he would get by with it.' Did Mr. Long answer that question true or false?

A. True.

Q. Question 298, 'If several people find themselves in trouble the best thing for them to do is to agree upon a story and stick to it.' Did Mr. Long answer that question true of false?

A. True.

Q. Question 316, 'I think nearly anyone would tell a lie to keep out of trouble.'

A. He answered true.

Tr. II 779–80.

This is precisely the type of testimony that 22 O.S.Supp.1985, § 1175.4(D) was designed

to prevent. Absolutely disregarding the clear language of Section 1175.4(D), the prosecutor used Long's own statements, made without benefit of counsel, to portray him as a fundamentally bad person and a liar during both phases of trial. While defense counsel did in fact cross-examine Mr. Lee, I do not agree with the majority that doing so somehow waived Long's Fifth and Sixth Amendment rights. *See Majority* at 174. In my opinion, Long's own words, as presented through Mr. Lee's testimony, could have formed the basis for the jury's finding that the mitigating evidence presented during second stage proceedings was outweighed by the "heinous, atrocious and cruel" and "great risk of death to more than one person" aggravating circumstances found to support Sheryl Graber's murder.

During oral argument, the State agreed that the mitigation evidence presented in this case was overwhelming. In fact, the jury refused to find the existence of the "continuing threat" aggravator for either murder. Although Long's clearly inadmissible answers to the pretrial psychological examination were neither reiterated nor specifically reintroduced during the sentencing phase, I believe that, having come from Long's own lips, those answers had a lasting and "profound impact on the jury...." *Fulminante, supra,* 499 U.S. at 296, 111 S.Ct. at 1257.

Further, the pieces of human flesh which were admitted over defense counsel's objection during first stage proceedings were not only grotesque and inflammatory, but were completely unnecessary to prove the prosecution's case. Finally, the prosecutor's quotation from the Bible, prejudicial in and of itself, was all the more influential because it was the last message the jury heard before retiring to deliberate over Long's sentence. I simply cannot conclude that these errors, coupled with Stephen Lee's testimony, did not influence the jury's decision to impose the death sentence for Sheryl Graber's murder.

There was never an issue in this case as to whether Long committed murder. The gravely important question was whether he should be sentenced to death for having done so. After seeing pieces of flesh that had been gouged from Sheryl Graber's body, hearing testimony which included clearly inadmissible and highly prejudicial statements that came from Long's own lips, and being read to from the Bible, the jury in this case concluded that he should. While the jury might have reached this conclusion even without the improperly admitted evidence and prosecutorial comment, it is impossible to say so beyond a reasonable doubt. *Id.* at 300–04, 111 S.Ct. at 1260–61. Accordingly, I would reverse Long's sentences of death, impose a life sentence for the murder of Andy Graber, and remand the conviction for Sheryl Graber's murder to the trial court with instructions to resentence without consideration of the improperly admitted evidence. *See* 21 O.S.Supp.1985, § 701.13(E)(2).