Kenneth Chad CHARM, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–94–1069.

Court of Criminal Appeals of Oklahoma.

Aug. 22, 1996.

Rehearing Denied Sept. 30, 1996.

756

John M. Stuart, Randall R. Lyle, Duncan, OK, for Defendant.

Fred C. Smith, Assistant District Attorney, Lawton, OK, for State.

Anne M. Moore, Oklahoma Indigent Defense System, Norman, OK, for Appellant on Appeal.

W.A. Drew Edmondson, Attorney General, Bill L. Humes, Assistant Attorney General, Oklahoma City, OK, for Appellee on Appeal.

## OPINION

CHAPEL, Vice Presiding Judge:

Kenneth Chad Charm was tried by a jury in Comanche County District Court Case No. CRF–93–259 and convicted of First Degree Malice Aforethought Murder in violation of 21 O.S.1991, § 701.7 (Count I), First Degree Rape, After Former Conviction of Two or More Felonies in violation of 21 O.S.1991, § 1114(A)(3) (Count II), and Kidnapping, After Former Conviction of Two or More Felonies in violation of 21 O.S.1991, § 741 (Count IV).[1] The jury found the existence of the following three aggravators: that the murder was committed to avoid lawful arrest or prosecution; that the murder was especially heinous, atrocious or cruel; and, that Charm constituted a continuing threat to society.[2] In accordance with the jury's recommendation, the Honorable Roy D. Moore sentenced Charm to death on Count I, to one hundred-twenty years imprisonment on Count II, and to fifty-four years imprisonment on Count IV.

On July 20, 1993, Kenneth Charm and Ron Jessie kidnapped, raped and murdered fourteen year-old Brandy Hill. Charm confessed to police, describing in detail how the events unfolded and how he was involved in their development. His defense at trial was that he was too intoxicated on drugs and liquor to have formulated the specific intent to kill.

### PRETRIAL ISSUES

In his first proposition, Charm argues that his murder conviction and death sentence are void because the Information did not allege the essential elements of first degree malice aforethought murder and thus failed to confer subject matter jurisdiction on the district court. Indeed, rather than prop-

1. Count III pertained solely to Charm's codefendant.

2. See 21 O.S.1991, § 701.12.

erly stating that Charm committed the first degree murder with "malice aforethought," the Information filed against him stated—in outdated statutory language—that he committed the homicide "with a premeditated design to effect the death" of the victim. Citing *Pickens v. State* [3] and *Miller v. State,* [4] Charm claims this technical, linguistic error deprived the trial court of subject matter jurisdiction and violated due process. This claim does not warrant relief.

In *Miller,* this Court held that an Information which does not allege each element of the crime charged is not only violative of due process, but that such a defective Information fails to confer subject matter jurisdiction on the trial court. However, we recently overruled *Miller*'s "bright line" rule in *Parker v. State,* [5] concluding that defects in the charging language of an Information will no longer automatically deprive the trial court of subject matter jurisdiction.[6] Instead, such defects will be assessed under due process standards. "Where the Information alleges an offense and pleads particular facts constituting the offense in ordinary language, such that a person of common understanding can know what is intended and prepare a defense to the charge, no due process violation occurs." [7] The Information in this case states that Charm

unlawfully, wilfully and feloniously, without authority of law, and with a premeditated design to effect the death of one Brandy Crystian Hill, a human being, did then and there kill one Brandy Crystian Hill by means of a blunt instrument, to-wit: hammer, held in the hands of the said defendant[ ] and with which [he] hit and clubbed

the said Brandy Crystian Hill in the head, causing mortal wounds to the head and body of the said Brandy Crystian Hill and from which mortal wounds the said Brandy Crystian Hill did languish and die. . . .

Although this Information did in fact use the old "premeditated design" language rather than "malice aforethought," there is nothing ambiguous about the charge and Charm does not claim that there was. This Information was sufficient to put Charm on notice that he was being charged with and had to defend against first degree malice aforethought murder. Accordingly, it did not violate due process. This proposition is denied.

### GUILT/INNOCENCE ISSUES

█ In his second proposition, Charm claims the trial court violated his constitutional rights by failing to instruct the jury on the lesser included offenses of second degree murder or first degree manslaughter after instructing the jury on the defense of voluntary intoxication. The trial court administered Charm's requested instructions covering his sole defense of voluntary intoxication. However, the trial court refused to give Charm's requested instruction on second degree murder. Charm now argues that the trial court should have given his requested second degree murder instruction, and also should have *sua sponte* administered a first degree manslaughter instruction.

Without the instructions on second degree murder and first degree manslaughter, Charm argues, the jury's only options were convicting or acquitting him of first degree murder.[8] Charm claims, on authority of

**3.** 885 P.2d 678 (Okl.Cr.1994). Charm cites *Pickens* to support his claim that an Information charging first degree malice aforethought murder must make some reference to "malice aforethought." The Information in *Pickens,* like the one in this case, used the outdated phrase "premeditated design." Though we concluded this was an error, it did not form the basis of our reversal in *Pickens.* As dicta, it does not provide Charm a basis for relief.

**4.** 827 P.2d 875 (Okl.Cr.1992).

**5.** 917 P.2d 980, 985–987 (Okl.Cr.1996).

**6.** *Id.* at 985.

**7.** *Id.* at 986.

**8.** Nothing in the voluntary intoxication instruction suggests that if the jury finds lack of intent for malice murder, they must automatically consider a lesser included offense. In fact, OUJI–CR 735 provides that if the State fails to prove intent beyond a reasonable doubt due to an accused's intoxication, the jury must simply find the accused not guilty of that particular crime.

*Schad v. Arizona,*[9] *Beck v. Alabama,*[10] and *Pickens,*[11] that the trial court's failure to provide the jury with a third, non-capital option violated his Eighth and Fourteenth Amendment rights. Charm is incorrect.

■ *Beck* and *Schad* held that "in death cases, the jury must be instructed on lesser included noncapital offenses **supported by the evidence,** in order to give the jury a viable option between acquittal and a death penalty offense."[12] Thus, lesser included offense instructions need not automatically be given in death cases, but are required only when supported by the evidence. The evidence in this case did not support an instruction on either first degree manslaughter or second degree murder, and the trial judge thus properly refused to administer them.

The crime of first degree manslaughter on which Charm claims the trial court should have administered an instruction is found at 21 O.S.1991, § 711(2). A homicide is first degree manslaughter "[w]hen perpetrated without a design to effect death, and in a heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon...." To warrant a manslaughter instruction, the evidence must "reasonably suggest that [the accused] committed the murder in the heat of passion and without an intent to kill."[13] The "passion" necessary to support a manslaughter instruction must be so great as to "render the mind incapable of forming a design to effect death...."[14] The elements of heat of passion are 1) adequate provocation; 2) a passion or emotion such as fear, terror, anger, rage or resentment; 3) homicide occurred while the passion still existed and before a reasonable opportunity for the passion to cool; and 4) a causal connection between the provocation, passion and homicide.[15]

Charm does not present and the record does not reflect evidence of victim provocation and the requisite resulting emotional response of the perpetrator which must exist before a manslaughter instruction may be properly administered. The evidence establishes that upon no provocation whatsoever, Charm strangled and bludgeoned the victim with the specific intent to cause her death. These facts do not support a first degree manslaughter instruction.

■ The crime of second degree murder for which Charm requested an instruction is set forth at 21 O.S.1991, § 701.8(1). There, second degree murder is defined as a homicide "perpetrated by an act imminently dangerous to another person and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual...." The facts in this case reveal that Charm helped his accomplice kidnap their friend's fourteen year-old daughter and drive her into an isolated area; that he watched while his accomplice attempted to rape her; that he raped her himself; that his accomplice began choking her until blood came out of her mouth; that he noted to his accomplice, "You didn't kill her, man"; that he (Charm) tried to choke her but "she wouldn't die"; that his accomplice then hit her in the head with a sledgehammer; that Charm noted she was still shaking; that Charm—afraid of going to jail— "grabbed the hammer from [his accomplice], and ... hit her to make sure she was dead"; and that he was an equal participant in these acts. Nothing in these facts suggests anything but a design to effect the death of one specific person.[16] These facts

**9.** 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991).

**10.** 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980).

**11.** 885 P.2d at 682–83.

**12.** *Id.* at 682 (emphasis added).

**13.** *Hogan v. State,* 877 P.2d 1157, 1165 (Okl.Cr. 1994) (Chapel, J., dissenting), *cert denied,* —— U.S. ——, 115 S.Ct. 1154, 130 L.Ed.2d 1111 (1995).

**14.** *Allen v. State,* 821 P.2d 371, 374 (Okl.Cr.1991) (quoting *Walker v. State,* 723 P.2d 273, 284 (Okl. Cr.1986), *cert denied,* 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 600 (1987).

**15.** *Allen,* 821 P.2d at 374.

**16.** *See Paxton v. State,* 867 P.2d 1309, 1317 (Okl. Cr.1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 227, 130 L.Ed.2d 153 (1994) (second degree murder instruction appropriate only "where there is no premeditated design to kill any partic-

do not support a second degree murder instruction.

■■■■ The only arguable justification for a first degree manslaughter or second degree murder instruction in this case comes from the trial judge's conclusion that the evidence warranted an instruction on the defense of voluntary intoxication. Contrary to the trial judge's conclusion, however, the evidence did not support a jury instruction on the defense of voluntary intoxication. To be entitled to such a defense instruction, Charm was required to present evidence sufficient to raise a reasonable doubt concerning his ability to form the specific intent to kill.[17] He did not meet this requirement and the trial judge should not have administered a voluntary intoxication instruction.

In his confession, Charm did state that he had not eaten and had been drinking and taking pills prior to the murder. Witnesses who saw Charm just prior to the commission of these crimes also testified that they had seen him drinking. However, those witnesses further testified that Charm did not appear intoxicated. Additional evidence belying Charm's claim of intoxication came from his own lips, from which he gave a detailed description of all the events leading up to, included in and following the rape and murder. Charm described how he had backed the car over one thousand feet into the deserted area where he and his accomplice raped and killed the victim. He described his thoughts, actions and reactions during the entire scenario. He described how, after murdering the victim, he and his accomplice returned to her house to establish their alibi. We held in *Valdez*[18] that a defendant who is able to give such a detailed, lucid account of his past criminal conduct is hard pressed to argue that he or she was significantly intoxicated at the time of the incident.

Even though some of the facts concerning Charm's level of intoxication were conflicting, there was not "sufficient evidence of impairment 'to raise a reasonable doubt as to [Charm's] ability to form the requisite criminal intent' to commit first degree murder."[19] Thus, we find that the trial court abused its discretion in even administering a voluntary intoxication instruction. Charm cannot use the fact that this unjustifiable instruction was given to support his current claim that the evidence warranted lesser offense instructions on second degree murder and first degree manslaughter. This proposition is denied.

■■■ Charm argues in his third proposition that the trial court violated his constitutional rights in failing to conduct a requested *Jackson v. Denno*[20] hearing concerning the admissibility of his custodial confession. Prior to trial, defense counsel filed and argued a written motion to suppress Charm's confession. That motion, however, was urged on the grounds that Charm's confession was obtained after an unlawful arrest and thus should not be admitted. The judge denied that suppression motion and the issue of voluntariness was neither raised nor ruled upon.

Charm obtained a different attorney for trial. That attorney renewed the previously filed motion to suppress, which had been based upon the unlawful arrest argument. Defense counsel then asked for an *in camera* hearing on that motion to suppress. The State responded by arguing the motion to suppress had already been denied. Again, the judge overruled defense counsel's motion to suppress.

The State then began requesting admission of exhibits. When the State reached Charm's videotaped confession, defense counsel reurged his motion to suppress and orally requested an *in camera Jackson v. Denno*

---

ular person."). *See also Palmer v. State,* 871 P.2d 429, 432 (Okl.Cr.1994).

17. *Valdez v. State,* 900 P.2d 363, 379 (Okl.Cr.), *cert. denied,* —— U.S. ——, 116 S.Ct. 425, 133 L.Ed.2d 341 (1995); *Crawford v. State,* 840 P.2d 627, 638 (Okl.Cr.1992).

18. 900 P.2d at 379.

19. *Fontenot v. State,* 881 P.2d 69, 83 (Okl.Cr. 1994) (quoting *Calhoun v. State,* 820 P.2d 819, 822 (Okl.Cr.1991)).

20. 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

hearing. Charm raised no specific grounds to support an involuntariness argument, and the judge once again overruled defense counsel's motion. Then, after reviewing Charm's taped confession, and requiring that some prejudicial portions be edited out, the trial judge admitted it—with proper jury instructions—during first stage.

Charm argues on appeal that the trial judge adamantly and consistently refused to conduct his requested *Jackson v. Denno* hearing to determine the voluntariness of his confession. Charm claims the trial judge's failure to conduct an *in camera* hearing and to make an independent determination of voluntariness violated Charm's Fifth, Eighth and Fourteenth Amendment rights. Charm claims that had he been granted a *Jackson v. Denno* hearing, he could have attacked the quality of *Miranda* warnings given to him [21] prior to his confession and could also have argued that he was under the influence of drugs and alcohol when he gave his confession.[22]

After reviewing the record, we believe that confusion over which motions and issues had already been addressed and ruled upon contributed to the trial court's decision to deny Charm's requested *Jackson v. Denno* hearing.[23] Nonetheless, upon receiving Charm's specific request for a *Jackson v. Denno* hearing, the trial court should have held one. Accordingly, we remanded the case to the district court with instructions to conduct a hearing to determine whether Charm's confession to the crimes for which he was tried and convicted was voluntary.

On May 22, 1996, the Honorable Roy D. Moore held the required *Jackson v. Denno*

hearing and determined that Charm's confession was voluntarily given. The transcript of that hearing and the judge's resulting Findings of Fact support this determination. Charm's confession was thus properly admitted and proposition three is denied.

### SECOND STAGE ISSUES

■ In proposition four, Charm claims inadmissible evidence introduced by the State in support of the continuing threat aggravating circumstance violated his Sixth, Eighth and Fourteenth Amendments rights. Charm first attacks the trial court's admission of his post-homicide acts to prove that he posed a continuing threat to society. In accordance with OUJI–CR 435, the trial court instructed the jury that it was to consider whether, *at the time the murder was committed,* any one of the three alleged aggravators existed. Charm argues that the trial court erred in allowing the State to prove continuing threat through the introduction of evidence of Charm's other crimes and bad acts which occurred *after* the homicide and before his arrest three days later. While Charm objected to the use of unadjudicated offenses, he did not specifically object on the grounds that post-homicide conduct was irrelevant under OUJI–CR–435. Accordingly, Charm's current complaint will be reviewed for plain error only.[24]

■ To establish "continuing threat," the State must show "a pattern of criminal conduct that will likely continue in the future."[25] To meet this burden, the State may introduce evidence of the defendant's bad acts or unadjudicated offenses.[26] The most

---

**21.** Charm had signed a written waiver and had also acknowledged on the tape that he was freely confessing and had received his rights.

**22.** Charm does not claim that his confession was the product of any police coercion, except insofar as such a claim might be predicated upon his *Miranda* warning argument.

**23.** During second stage, defense counsel requested and the trial court granted a *Jackson v. Denno* hearing on a separate confession Charm had given to another crime. Thus, the trial judge appeared quite willing to grant such a hearing when he believed the voluntariness of a confession had not yet been determined.

**24.** *See Armstrong v. State,* 811 P.2d 593, 599 (Okl.Cr.1991).

**25.** *Perry v. State,* 893 P.2d 521, 536 (Okl.Cr. 1995).

**26.** *Perry,* 893 P.2d at 536. While this is the current rule of law to which a majority of this Court adheres, I have consistently disagreed with the use of unadjudicated offenses to support the continuing threat aggravating circumstance. *See Cannon v. State,* 904 P.2d 89, 106, n. 59 (Okl.Cr. 1995), *cert. denied,* — U.S. —, 116 S.Ct. 1272, 134 L.Ed.2d 219 (1996).

common grounds alleged to prove the continuing threat aggravator include the defendant's history of violent conduct, the facts of the homicide at issue,[27] defendant's threats, lack of remorse, attempts to prevent calls for help, mistreatment of family members and testimony of experts.[28] *"Any relevant evidence* showing the probability that the defendant will commit future acts of violence would support the finding that a defendant will be a continuing threat." [29]

Nothing in our case law suggests that evidence of the defendant's bad acts or unadjudicated offenses committed *after* the homicide would not be admissible to prove continuing threat.[30] While OUJI–CR–435 does instruct the jury to consider whether the alleged aggravators existed *at the time of the homicide,* it does not imply that post-homicide evidence can have no relevance on that issue. In this case, the State introduced evidence that after the murder, Charm robbed a fast food store, threatened to kill the clerk and stole a car. In addition to this post-offense conduct, the State presented evidence that Charm threatened his wife's life during his confession. Finally, Charm's actions immediately after the murder—from visiting the victim's father's house to picking up two young girls for a night of partying—evince a total lack of remorse. These facts properly established that Charm posed a continuing threat to society. There was no plain error here.

■ Charm next argues that admitting into evidence certain parts of his confession to the convenience store robbery violated his Eighth and Fourteenth Amendment rights. During second stage, the State called the detective to whom Charm had confessed to robbing the store.[31] The prosecutor intended to play the taped confession, and began

asking the detective some preliminary questions. Just after the detective testified that Charm confessed to the robbery, defense counsel objected and the parties had a bench discussion over whether the taped confession was admissible. At defense counsel's request, the trial judge conducted a *Jackson v. Denno* hearing. During the hearing, the judge learned that part of the taped confession to the convenience store robbery included Charm's vehement denial that he had committed an additional liquor store robbery. At the end of the hearing, the trial judge ruled the confession inadmissible "to be on the safe side." However, the judge then allowed the prosecutor to ask the detective whether Charm had confessed to robbing the convenience store.

Charm now argues that it was improper for the judge to suppress the confession as involuntary, and to then allow the prosecutor to elicit the very information which had been ruled inadmissible on this basis. Charm incorrectly characterizes the judge's ruling. The judge did not rule the confession involuntary. From his statements on the record, it is clear the judge suppressed the confession for two other reasons: one, it contained information which was cumulative of other, previous testimony; and two, it contained Charm's reference to another liquor store robbery which he denied having committed.

Nowhere does the trial judge state that he suppressed Charm's convenience store robbery confession because it was involuntary. Accordingly, the trial judge's decision to allow the State to make limited inquiry into Charm's admissions concerning the convenience store robbery did not contravene his earlier ruling. This argument is meritless.

---

27. As I stated in *Cannon,* I believe the facts of the homicide at issue provide tenuous if any support for the continuing threat aggravator.

28. See *Cannon,* 904 P.2d at 106.

29. *LaFevers v. State,* 897 P.2d 292, 307–08 (Okl. Cr.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 820, 133 L.Ed.2d 763 (1996) (emphasis added).

30. The State provides two cases in which this Court allowed the State to use a defendant's post-homicide acts to prove continuing threat.

See *LaFevers,* 897 P.2d at 307 (State introduced evidence that defendant during incarceration stabbed several inmates and fought with a prison guard); *Grasso v. State,* 857 P.2d 802, 809 (Okl. Cr.1993) (State introduced evidence that defendant killed another person).

31. The convenience store clerk had already testified and identified Charm as the one who robbed her.

■ Third, Charm attacks the testimony of his former probation officer, Linda Jordan. She basically summarized Department of Corrections records concerning Charm. She described eight of Charm's former Judgments and Sentences; three certificates of completion awarded to Charm for having finished a substance abuse awareness program, a lawn and garden repair program and a daily living skills program; six misconduct reports filed against Charm for transgressions such as possessing contraband and fighting with other inmates; a set of monthly evaluation reports, most of which were good; and finally, one report in which another inmate accused Charm of trying to force him into homosexual acts.

Charm claims these documents constituted investigative reports and factual findings that are excluded as hearsay under 12 O.S.1991, § 2803(8)(a)-(e). Charm failed to object to Jordan's testimony and failed to raise any hearsay objection to the admission of these specific exhibits. He has thus waived all but plain error.

Under 12 O.S.1991, § 2803(8),

records, reports, statements or data compilations in any form of a public office or agency setting forth its regularly conducted and regularly recorded activities or matters observed pursuant to duty imposed by law and as to which there was a duty to report, or factual finding resulting from an investigation made pursuant to authority granted by law

are *not* excluded as hearsay. However, the following *are* excluded as hearsay under section 2803:

a. investigative reports by police and other law enforcement personnel,

b. investigative reports prepared by or for a government, a public office or agency when offered by it in a case in which it is a party,

c. factual findings offered by the government in criminal cases,

d. factual findings resulting from special investigation of a particular complaint, case or incident, or

e. any matter as to which the sources of information or other circumstances indicate lack of trustworthiness[.]

Charm claims the documents about which Jordan testified were "investigative reports" and "factual findings" as defined by this section and thus should have been excluded as hearsay. Charm is mistaken.

The documents Jordan described contained no factual findings or details of any investigation. Rather, they were simply documents kept by the DOC in its normal course of business which reflected Charm's history within the system.[32] In fact, many of Jordan's documents were favorable to Charm. Some reflected certificates he received for completing certain training courses; some reflected positive work evaluations. Their admission did not constitute plain error.

■ Fourth and finally, Charm delineates certain pieces of evidence which he claims were irrelevant on the issue of whether he constituted a continuing threat to society. He specifically attacks several witnesses' testimony.

David New, an Austin police officer, testified that about a year before the murder at issue, he witnessed Charm fighting with an ambulance crew at the scene of a car accident. Because defense counsel did not object to this testimony on the basis of relevance, he has waived all but plain error as to its admission. Another Austin police officer then testified that he had responded to a domestic disturbance several weeks after the ambulance incident, and that the fight was between Charm—who appeared hostile and intoxicated—and an hispanic woman, who seemed very afraid of Charm. Charm did not object to this testimony. Lawton police officer Larry Mahamed testified that in 1985, Charm confessed to having committed burglary and larceny. Charm did not object to this testimony. Finally, Brenda Wilson testi-

---

**32.** *See Hall v. State,* 650 P.2d 893, 899 (Okl.Cr. 1982) (prison records containing information about an inmate's history of misconduct within the system fell within the business records exception to the hearsay rule found at 12 O.S.1981, § 2803(8), and were not excluded under section 2803(8)(a)–(e)). *See also Frazier v. State,* 874 P.2d 1289, 1292 (Okl.Cr.1994) ("pen-pack" falls squarely within section 2803).

fied that on the evening of the homicide at issue, she—then fourteen years old—had sex with Charm. Charm objected to this testimony, arguing that it was irrelevant and immaterial.

■ As previously stated, to meet its burden to prove the continuing threat aggravator, the State is entitled to introduce any relevant evidence showing the probability that the defendant will commit future acts of violence. All the testimony about which Charm now complains had some bearing on his propensity for violence and on his lack of remorse for having murdered a young woman whom he knew. It was thus properly admitted to prove that Charm poses a continuing threat to society. This argument and proposition four are denied.

Charm claims in proposition five that his death sentence must be vacated because the use of victim impact evidence at his sentencing proceeding violated his Eighth and Fourteenth Amendment rights. Over defense counsel's objection, the State called to the stand the victim's mother and father to present victim impact testimony. The victim's father, Mike Hill, testified about his feelings on the day his daughter was born, about the special bond that existed between him and his daughter, about his divorce from her mother, and about the summer visit he and his daughter were having when she was killed. He also stated that he blamed Charm for his daughter's death and could never forgive Charm for what he had done. Betty Hill, the victim's mother, testified in much the same manner. Their testimony spanned only fourteen pages of transcript.

■ Charm first claims the victim impact statements were presented in violation of the procedure set forth in 22 O.S.Supp.1993, § 984.1(A). The chosen family members presented their testimony in a question-and-answer format.[33] Charm claims section 984.1 requires that the statements be prepared ahead of time and read aloud. He argues that because the statements were not pre-

pared ahead of time, he was—to his disadvantage—unable to learn their contents prior to trial.

■ Charm misconstrues the statute, which allows the family members to present their victim impact testimony either in person or through a written statement. There is no requirement that the statements be memorialized in written form and given to the defendant prior to their presentation. The State properly provided Charm with a notice of intent to offer victim impact evidence, which included the names of the family members who would be testifying and a synopsis of their statements. This provided Charm sufficient notice of the contents of the victim impact statements.

■ Second, Charm claims that victim impact testimony operates as a "super aggravator," prejudicially skewing the operation of Oklahoma's capital sentencing scheme. He claims that because Oklahoma juries during the second stage of a capital trial must weigh aggravating evidence against mitigating—and victim impact evidence constitutes neither—victim impact evidence is essentially meaningless and serves only to prejudice the defendant. Charm claims this type of evidence will always tip the scales in favor of aggravation.

This Court addressed a similar argument in *Cargle*.[34] We held that victim impact evidence and aggravation evidence are very different and serve very different purposes. Despite the existence of victim impact evidence in a given case, the State is still required to prove at least one aggravator beyond a reasonable doubt before the death penalty may be imposed.

Charm has presented no evidence that—but for the brief and properly limited presentation of victim impact testimony during second stage—the jury in his case would not have found the existence of any of the three alleged aggravating circumstances. The jury was specifically instructed that in determining Charm's sentence, it could consider only

---

**33.** This Court has sanctioned this format. *See Cargle v. State*, 909 P.2d 806, 828 (Okl.Cr.1996) (suggesting the trial court consider whether a question-and-answer format may be a preferable

method of controlling the presentation of victim impact evidence).

**34.** *Id.* at 828, n. 15.

those aggravating circumstances set forth in the instructions. The State specifically alleged those aggravators in the Bill of Particulars, and provided sufficient evidence to support them during the second stage of trial. There is simply no indication that Charm's jury relied upon the victim impact testimony to find the existence of the three alleged aggravating circumstances.

Third and finally, Charm claims his constitutional rights were violated because the jury was not instructed as to the legal effect of the victim impact evidence in his case. The jury received the standard second stage instructions on aggravating and mitigating evidence and on its duty to weigh such evidence, but was not instructed on the manner in which to factor in victim impact evidence. In *Cargle*,[35] this Court designed a victim impact evidence instruction and held that it is to be administered in all future capital cases where victim impact evidence is introduced. Because the trial in Charm's case had already occurred by the time *Cargle* was handed down, the trial judge in Charm's case cannot be faulted for having failed to administer the *Cargle* instruction.

Charm did not offer any instruction on victim impact evidence, and did not complain that the trial judge did not administer one. On appeal, Charm has failed to demonstrate how the lack of a victim impact evidence instruction harmed him. He has not demonstrated that the jury's sentencing discretion was not properly channeled, that the victim impact evidence influenced the jury to impose a sentence not supported by the evidence, or that the evidence was insufficient to support the three alleged aggravators the jury found to have existed. This argument and proposition five are denied.

Charm argues in proposition six that his due process rights under the Fourteenth Amendment and his right to a reliable sentencing determination under the Eighth Amendment were violated when the trial court, at the state's request and over defense objections, instructed Charm's sentencing jury that it could consider his flight from the crime scene as evidence of guilt for sentencing purposes. During the first stage of trial, the trial court refused to administer the State's requested instructions on flight. However, the trial court did administer standard flight instructions during the sentencing phase. Charm interposed a general objection to the instructions, but did not specifically object to the flight instruction. Accordingly, he has waived all but plain error on appeal.[36]

Charm argues the administering of the flight instruction during second stage improperly authorized the jury to consider his flight as a factor in determining the existence of the three alleged aggravators.[37] Specifically, he claims the instruction injected an irrelevant, arbitrary, and prejudicial factor into the sentencing determination, either by improperly bolstering the State's proof of aggravating factors or by charging the jury that Mr. Charm deserved a more serious punishment if the jury found he fled the scene of the crime. The State claims that if any error occurred, it was harmless beyond a reasonable doubt.

The trial judge does not explain and we cannot surmise why he administered a flight instruction during the second phase of this capital trial. The sentencing phase is not the appropriate time for a flight instruction, and the trial court erred in administering one during that phase of Charm's trial. Howev-

---

**35.** *Id.* at 828–29.

**36.** *See Pugh v. State,* 416 P.2d 637, 640 (Okl.Cr. 1966) ("General exceptions to instructions of the court to the jury will not be considered on appeal. When counsel desire to except to any instruction, the attention of the court should be directly called to the instruction objected to in order that the court may be given an opportunity to correct any error it may contain. If this is not done, errors in instructions will be waived, unless they are fundamentally erroneous."). *See*

*also Samples v. State,* 337 P.2d 756, 765 (Okl.Cr. 1959) (same).

**37.** We note that *Mitchell v. State,* 876 P.2d 682, 683–86 (Okl.Cr.1993)—which held that flight instructions should be given only where a defendant controverts evidence of flight or voluntarily admits to having departed the crime scene—does not apply here. The *Mitchell* rule applies only when a flight instruction is administered during the first stage of trial.

er, the error was harmless beyond a reasonable doubt.

Assuming the jury improperly considered Charm's flight to support the three alleged aggravating circumstances, nothing is offered and we find nothing to suggest that the flight instruction determined Charm's sentence. This was not a case in which the admissible evidence properly supporting the alleged aggravating circumstances was questionable or weak and the injection of an improper factor tipped the scales in favor of guilt. On the contrary, the properly admitted evidence overwhelmingly supported each of the three alleged aggravators. While the trial court erred in administering a flight instruction during the second phase of Charm's trial, the error was harmless. Proposition six is denied.

In proposition seven, Charm claims his Fifth, Sixth, Eighth and Fourteenth Amendment rights were violated when the trial court allowed him to testify on his own behalf during second stage proceedings only on the condition that he answer every question asked by the prosecutor on cross-examination. Charm was the last witness to testify for the defense during second stage. In a prior *in camera* proceeding, defense counsel informed the judge that he was advising Charm to exercise his Fifth Amendment privilege and not take the stand. Defense counsel informed the judge that Charm wished to testify anyway. The trial judge then asked Charm whether he really wished to testify. Charm replied, "No, not testify. I want to make a statement—Well, testify, yes."

The trial judge then informed Charm that if he took the stand, he would have to testify under oath and he would be subject to cross-examination by the State. Defense counsel stated that he had advised Charm that he would waive his privilege against self-incrimination if he took the stand. Defense counsel also informed the trial judge that Charm might attempt to invoke the privilege again from the stand. The trial judge replied that Charm would probably not be able to invoke the privilege once he had begun testifying.

After the prosecutor and defense counsel argued over whether Charm would be allowed to take the stand, make a speech and then refuse to answer any of the State's questions, the trial judge allowed Charm to testify. Prior to direct examination, the judge called the parties to the bench and ultimately back into chambers. There, the judge told Charm that he was under oath, and that he would allow him to testify only if Charm could promise to answer all questions truthfully and to the best of his ability—even those propounded by the State. He told Charm he was concerned about what the jury would think of him if he cooperated with his own attorney, and then refused to answer any of the State's questions. Ultimately, Charm told the trial judge that he would answer all questions to the best of his ability, but never promised that he would not invoke the Fifth Amendment from the stand. The trial judge allowed Charm to testify, stating, "I think that's all we can do."

Charm then testified on direct as follows:

Q: "Kenneth, you understand you have been convicted of first degree murder?

A: Yes, I do.

Q: Rape?

A: Yes, I do.

Q: Kidnapping?

A: Yes, I do.

Q: How do you feel about that?

A: Uh, a fourteen year old girl's life was taken, uh, for unexplanatory reasons. Uh, I uh,—I can't believe—can't begin to express under any kind of circumstances why it's—it's—or I can't give the—the mother any kind of explanation either of why I—it's—I—it could have been prevented. Uh, uh, I wish not to relive that moment but if asked of me uh,—I don't know. I feel remorse.

I—I asked—when I gave that interview that I said I deserved to die but I sat downstairs and with the help of some family members I have rethought about uh, a whole lot of things in my life. And uh, she just—it's—there's no way of expressing it.

Uh, I've sat in that chair over there by you and the other attorney, and I tried to keep smiling to keep from crying. Uh, that to hear the evidence—for him to actu-

ally make me look like a uh, sadistic killer like I've went from country to country or something or uh,—which I'm not.

Uh, a man gets drunk and does—does something uncontrollable. I don't know. How else am I supposed to feel? Uh,—."

Following this testimony, the State then embarked on a lengthy cross-examination calculated to impeach Charm's credibility. Charm now claims that the net effect of his agreement with the trial judge to answer all questions truthfully, was to enable the State to exceed the proper bounds of cross-examination and elicit prejudicial and inadmissible testimony. Charm lodges three separate attacks against what occurred; we will address each in turn.

■ First, Charm claims the trial court's agreement with him concerning his Fifth Amendment privilege violated his Sixth Amendment right to the effective assistance of counsel and his Fourteenth Amendment right to present his defense. Defense counsel did not object to the trial court's agreement with Charm and thus waived all but plain error. For his Sixth Amendment argument, Charm claims that the trial court's agreement prevented him from taking the stand for the limited purpose of expressing remorse to the family of the victim, thus depriving him of the right to have his attorney present his defense in the manner he chose.

Charm cites *Brooks v. Tennessee* [38] to support his claim that the trial court improperly interfered with defense counsel's presentation of Charm's defense. *Brooks* is inapposite. That case addressed the constitutionality of a state statute which required a defendant who desired to testify to do so before any other defense witnesses had tes-

tified. The Supreme Court held, among other things, that this statute violated Brooks's right to have counsel assist in his defense, since it "requir[ed] the accused and his lawyer to make [the decision whether or not to testify] without an opportunity to evaluate the actual worth of their evidence,...." [39] What Charm fails to note is that he had no right to present his defense in the manner he had selected, which was to take the stand, to make a speech about being remorseful, drunk, out of control and not a sadistic killer, and then to leave without having to answer questions on cross-examination.[40] The trial court's agreement with Charm did not improperly interfere with defense counsel's ability to present a defense.

■ Citing the case of *Simmons v. United States,* [41] Charm next argues that the trial court's agreement violated his constitutional rights by forcing him to choose between his Fifth Amendment privilege and his Sixth Amendment right to the effective assistance of counsel. *Simmons* is also inapposite. In *Simmons,* one of the defendants wished to attack the government's search. To establish standing to contest the search, he believed he had to testify at a suppression hearing to show that he had a possessory interest in the thing searched. At trial, his testimony from the suppression hearing was admitted against him to prove his guilt. On appeal, the Supreme Court held that a defendant in such a position cannot constitutionally be forced to forego one constitutional right—a Fourth Amendment claim—in order to preserve another—the Fifth Amendment privilege against self-incrimination.

Once again, Charm incorrectly presumes that he had a right to take the stand for the limited purpose of expressing remorse to the

**38.** 406 U.S. 605, 92 S.Ct. 1891, 32 L.Ed.2d 358 (1972).

**39.** *Id.* at 612, 92 S.Ct. at 1895.

**40.** Charm did not cite any legal authority for his bald assertion that he had the right to take the stand for the limited purpose of expressing remorse to the family members of his victim. *Compare Doyle v. Ohio,* 426 U.S. 610, 617, n. 7, 96 S.Ct. 2240, 2244, n. 7, 49 L.Ed.2d 91 (1976) ("[U]nless prosecutors are allowed wide leeway in the scope of impeachment cross-examination

some defendants would be able to frustrate the truth-seeking function of a trial by presenting tailored defenses insulated from effective challenge."). Charm also fails to acknowledge that during his brief direct examination testimony, he made several self-serving statements that could not be characterized as simple expressions of remorse.

**41.** 390 U.S. 377, 394, 88 S.Ct. 967, 976, 19 L.Ed.2d 1247 (1968).

victim's family members. He did not. Accordingly, there was no Sixth Amendment "right" for him to relinquish when he took the stand.

▮▮▮ For his final argument, Charm claims that the trial court abused its discretion in allowing the prosecutor's cross-examination to exceed the scope of direct examination. Against the advice of counsel, Charm waived his privilege against self-incrimination and was subject to cross-examination to the same extent as any other witness would have been.[42] Charm acknowledges that trial courts may properly allow "cross-examination into matters which tend to explain, contradict, or discredit any testimony given by the witness or which tests his accuracy, memory, veracity or credibility."[43] Cross-examination may exceed the scope of direct in order to effect impeachment of a witness's accuracy, memory, veracity or credibility.[44] Despite the wide latitude given parties on cross-examination, however, Charm claims the State was allowed to go too far in conducting its cross-examination of him. Charm cites the agreement the trial court struck with him as the reason defense counsel failed to object to much of the State's questioning.

On direct examination, Charm basically testified to three things: that he felt remorse for killing the victim; that he was not a sadistic killer as the prosecutor tried to make him out to be; and, that he murdered the victim in a state of drunkenness and was not in control of himself. Thus, Charm was given a chance to tell the jury that he felt bad about what he had done, that he was not a sadistic killer who deserved the ultimate punishment, and that he was not in control of himself when he murdered the victim. The prosecutor rightfully spent a great deal of time on cross-examination asking Charm questions which were designed to impeach his credibility and to discredit this direct examination testimony.

These proper questions included whether Charm had ever used aliases and, if so, whether it was to avoid arrest and prosecu-

tion for other crimes; whether Charm was the same defendant named in the nine Judgment and Sentences previously presented to the jury; whether he stole from his mother; whether he could be rehabilitated; whether he had been involved in certain violent incidents while in prison; what happened on the day he killed the victim; and, what happened after the victim was murdered. Nowhere did the trial judge force Charm to answer questions. When the trial judge would remind Charm that he had agreed to answer all questions to the best of his ability, Charm would simply respond by saying "I don't know." At most, the trial judge encouraged him to give at least that much of a response. Charm was not forced to divulge anything that he had not already admitted in his confession. This argument and proposition seven are denied.

Charm argues in proposition eight that prosecutorial misconduct during second stage closing argument denied him his fundamental constitutional right to a fair trial and to be free from the arbitrary imposition of the death penalty. Charm argues generally that prosecutorial misconduct rendered his sentencing proceeding unfair. Of the six alleged instances of misconduct, Charm objected to only one. The other five will be reviewed for plain error only. We will address each in turn.

▮▮▮ First, Charm claims the prosecutor misstated the evidence when he referred to "all the homosexual advances" Charm made toward one of his prison cellmates. Even assuming this was a misstatement of the evidence, there is no plain error. The crimes Charm committed against the victim in this case were not portrayed as having been motivated by any latent homosexual tendencies he may have exhibited at some point in his past. Charm's prior advances toward his cellmate were used only to show that he had violent tendencies which the jury could consider in determining whether he posed a continuing threat to society.

---

**42.** *See Hopper v. State,* 302 P.2d 162, 166 (Okl. Cr.1956).

**43.** *Hall v. State,* 698 P.2d 33, 36 (Okl.Cr.1985).

**44.** *Id.*

■ Second, Charm claims the prosecutor's comment used to describe Charm's mindset—that "[k]illing the little girl isn't going to keep me from playing basketball and eating fried chicken"—was a racial slur. This was nothing more than a reasonable comment on the evidence, which showed that after killing his victim, Charm ate chicken and played basketball.

■ Third, Charm claims that the prosecutor improperly vouched for the credibility of one of the State's witnesses. The prosecutor, referring to the young girl with whom Charm had sex on the night of the homicide, told the jury that he saw no reason for her to have lied about what she and Charm had done. Even if this could be considered improper vouching for the credibility of a prosecution witness, there is no plain error. Charm had, in his confession, already admitted that after the murder, he and his accomplice picked up and spent the evening with two young girls. Even without the prosecutor's comments about her lack of motivation to lie, the jury had already heard evidence corroborating her story.

■ Fourth, Charm complains that the prosecutor misstated the evidence when he claimed that the defense had put on evidence that Charm was retarded. Defense counsel objected on this ground. The trial judge overruled the objection, stating that he recalled defense counsel mentioning retardation several times. The judge proceeded to admonish the jurors that they were the ones who had to decide what the evidence was, and that the lawyers' argument did not constitute evidence. The State concedes that this was an unintentional misstatement of the evidence, since defense counsel never actually referred to Charm as being retarded. Nonetheless, the trial court's admonishment that the jury was the sole arbiter of the evidence cured all but plain error.[45] Given the overwhelming evidence against Charm in both first and second stages, there is no plain error.

■ Fifth, Charm cites the prosecutor's statement that if Charm were allowed to live in prison, he could get sex and drugs. Charm does not explain why this is objectionable. The prosecutor's statement was based upon the evidence; the evidence reflected that during his previous prison stays, Charm had found both drugs and opportunities for sex.

■ Sixth and finally, Charm claims the prosecutor improperly implored the jury to "do its job" and "send a message" by putting Charm to death. Charm overlooks the prosecutor's subsequent comments, such as "if you decide to give Charm the death penalty . . ."; "If you recommend [the death penalty]"; and, "You are not here to deter anybody from anything. Except one person. That person is right here at this table." Thus, a complete and fair reading of the transcript reveals that the prosecutor was not improperly encouraging the jury to send a message to society by voting to execute Charm. This argument and this proposition are denied.

In proposition nine, Charm claims his death sentence should be vacated and his case remanded for resentencing or his sentence modified because there was insufficient evidence to support the aggravating circumstances. He also claims the aggravating circumstances the jury found in his case are unconstitutionally vague, and that the resulting death sentence violated his rights under the Eighth and Fourteenth Amendments.

■ The jury's finding that an aggravator exists will be upheld on appeal if, after viewing the evidence in the light most favorable to the State, this Court finds it was competent to support the aggravator in question.[46] The evidence was sufficient to support the three aggravators that Charm's jury found to have existed. Additionally, none are unconstitutionally vague. We will address each aggravating circumstance in turn.

■ To prove the heinous, atrocious or cruel aggravator, the State must show be-

**45.** *See Hammon v. State*, 898 P.2d 1287, 1305 (Okl.Cr.1995).

**46.** *Valdez*, 900 P.2d at 382; *Robinson v. State*, 900 P.2d 389, 402 (Okl.Cr.1995); *Bryson v. State*, 876 P.2d 240, 259 (Okl.Cr.1994), *cert denied*, —— U.S. ——, 115 S.Ct. 752, 130 L.Ed.2d 651 (1995).

yond a reasonable doubt that the murder was "preceded by torture or serious physical abuse, which may include the infliction of either great physical anguish or extreme mental cruelty." [47] "Absent evidence of conscious physical suffering of the victim prior to death, the required torture or serious physical abuse standard is not met." [48]

 Charm argues that because the fatal blow to the victim's head might have been the one inflicted first, the State did not prove beyond a reasonable doubt that the victim suffered the requisite serious physical abuse prior to death. To support his claim, Charm cites *Hawkins v. State* [49] in which this Court found the evidence insufficient to support the heinous, atrocious or cruel aggravator. The victim in *Hawkins* was drowned. While we ultimately held that the murder in that case was preceded by extreme mental cruelty sufficient to support the heinous, atrocious or cruel aggravator, we initially found that the drowning alone did not suffice to prove the serious physical abuse requirement. Charm claims that, as in *Hawkins,* there was no "gratuitous violence" inflicted on his victim beyond the act of the killing.

Contrary to Charm's contention, the facts in this case are vastly different from those in *Hawkins.* After repeatedly raping the victim, Charm's accomplice attempted to strangle her with a piece of a sheet. Charm confessed that blood was coming out of her mouth. The medical examiner testified that the victim's windpipe had hemorrhaged. Charm stated that he then tried to choke her as well, but that she would not die. Charm's accomplice then inflicted the first hammer blow to the victim's head. Charm confessed that even after the first blow to the head, she was still moving, shaking. This prompted Charm to hit her with the hammer, in the hopes that she would finally die. This evidence provides competent proof that the murder was preceded by serious physical abuse sufficient to support the heinous, atrocious or cruel aggravator.

 As for Charm's vagueness challenge, we have repeatedly held that this aggravator is not vague and that it properly channels the sentencer's discretion.[50] These arguments are without merit.

The State relied upon two pieces of evidence to support the murder to avoid arrest or prosecution aggravating circumstance: first, Charm's admission that part of his motivation in helping kill the victim was that he might go to jail if she were left alive; and second, the fact that the victim could have had Charm and his accomplice prosecuted for what they had done to her prior to killing her, i.e., kidnapping and raping her.[51]

 Charm argues that the evidence did not establish the existence of a predicate crime for which Charm was trying to avoid arrest when he killed the victim. "The focus of this aggravating circumstance is the state of mind of the murderer; it is he who must have the purpose of avoiding or preventing lawful arrest or prosecution. ... This aggravator also requires a predicate crime, separate from the murder, for which the appellant seeks to avoid arrest or prosecution." [52]

The evidence in this case supports the jury's conclusion that Charm and his accomplice murdered the victim to avoid arrest and prosecution for having raped and kidnapped her. These two assailants knew the victim and her father. The victim's father, apparently an informant, had even helped put

47. *Cheney v. State,* 909 P.2d 74, 80 (Okl.Cr.1995).

48. *Id. See also Battenfield v. State,* 816 P.2d 555, 565 (Okl.Cr.1991), *cert. denied,* 503 U.S. 943, 112 S.Ct. 1491, 117 L.Ed.2d 632 (1992).

49. 891 P.2d 586, 597 (Okl.Cr.1994), *cert. denied,* —— U.S. ——, 116 S.Ct. 480, 133 L.Ed.2d 408 (1995).

50. *See Robinson,* 900 P.2d at 402, and cases cited therein.

51. Charm first argues that because this evidence came from his confession, and his confession should have been ruled inadmissible, the evidence cannot now be relied upon to support the aggravator. However, his argument is moot since we have determined that the confession was properly admitted. *See supra* proposition three.

52. *Carter v. State,* 879 P.2d 1234, 1250 (Okl.Cr. 1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1149, 130 L.Ed.2d 1107 (1995) (citing *Banks v. State,* 701 P.2d 418, 426 (Okl.Cr.1985)).

Charm's accomplice's father in jail, so the two men were aware he would likely support their prosecution for rape and kidnapping if he were to find out what they had done to his daughter. This evidence amply supports this aggravator.[53]

Charm also argues this aggravator is unconstitutionally vague, since the State may allege it in any multiple offense or felony-murder scenario. He argues that to properly channel the sentencer's discretion in assessing this aggravator, the State should be required to prove that the dominant motive for the killing was witness elimination.

■ Proof sufficient to sustain this aggravator must include two things: a predicate crime—apart from the murder—for which the defendant sought to avoid arrest or prosecution; and, evidence establishing the defendant's intent to kill in order to avoid lawful arrest or prosecution. These evidentiary requirements, both of which were met in this case, sufficiently limit application of this aggravator.[54] These arguments are without merit.

■ For his attack on the evidence supporting the continuing threat aggravating circumstance, Charm claims much of the State's evidence was based upon the facts of the murder itself. Without elaborating, Charm simply claims that contrary to the

State's interpretation, the circumstances of his involvement in the murder mitigated against the jury's ultimate conclusion that he would commit future acts of violence.[55] We do not agree. Charm admitted he was an equal participant in the murder, that he tried to strangle the victim, and that he hit her in the head several times with a sledgehammer in an attempt to kill her. He did these things as this young victim—whose father he considered a good friend—begged for her life. Even without relying upon the facts of the murder itself, Charm's lack of remorse—coupled with evidence of his post and prehomicide violence—support the jury's finding that he poses a continuing threat to society.

Charm also argues that the continuing threat aggravator is unconstitutionally vague. We have repeatedly upheld the constitutionality of the continuing threat aggravator.[56] Charm offers no new reason to reexamine those holdings. These arguments and proposition nine are denied.

In proposition eleven, Charm claims that second stage jury instruction errors denied him his constitutional rights to due process and a reliable sentencing proceeding. He acknowledges that this Court has consistently rejected the arguments he raises, and states that he raises them again only to preserve their review by subsequent courts.[57]

**53.** *Compare Berget v. State*, 824 P.2d 364 (Okl.Cr. 1991), *cert. denied*, 506 U.S. 841, 113 S.Ct. 124, 121 L.Ed.2d 79 (1992) (victim murdered to prevent defendant's arrest for kidnapping); *Williamson v. State*, 812 P.2d 384 (Okl.Cr.1991), *cert. denied*, 503 U.S. 973, 112 S.Ct. 1592, 118 L.Ed.2d 308 (1992) (defendant found to have murdered victim to avoid arrest for rape).

**54.** *Cannon*, 904 P.2d at 107.

**55.** Charm initially argues that in previous propositions, he has established the inadmissibility of much of the evidence the State presented during second stage to prove this aggravator. However, we found none of his claims as set forth in those propositions to be meritorious.

**56.** *See Knighton v. State*, 912 P.2d 878, 895 (Okl. Cr.1996), and cases cited therein. We are aware that one federal district court has concluded that Oklahoma's continuing threat aggravating circumstance is unconstitutionally vague. *See Williamson v. Reynolds*, 904 F.Supp. 1529 (E.D.Okla.1995).

**57.** Charm first claims that instructions on the manner in which the jury was to weigh aggravating and mitigating circumstances created an improper burden of proof. We have consistently rejected this argument. *See Johnson v. State*, 911 P.2d 918, 930 (Okl.Cr.1995) and cases cited therein. Charm next claims that the trial court erred in failing to instruct the jury that it had the option to return a life sentence regardless of its findings on aggravating circumstances. We have consistently rejected this argument. *See Richie v. State*, 908 P.2d 268, 279–80 (Okl.Cr.1995) and cases cited therein. Third, Charm claims that, taken together, the standard jury instructions administered implied that jury findings regarding mitigating circumstances must be unanimous, and the jury should have been instructed that its findings do not have to be unanimous. We have consistently rejected this argument. *See Knighton*, 912 P.2d at 896 and cases cited therein. Finally, Charm claims that instructions on the issue of mitigating evidence permitted jurors to ignore mitigating evidence altogether and seriously diminished the effect of the mitigating evidence presented. We have consistently rejected this argument. *See Richie*, 908 P.2d at 279.

Charm provides no new or compelling reasons for this Court to alter its position on these issues, and we decline to do so. Proposition eleven is therefore denied.

In a final proposition, Charm argues that error accumulation rendered both stages of his trial unfair. While we have acknowledged several trial errors, they do not—either separately or together—require reversal.[58] Accordingly, this proposition is denied.

## MANDATORY SENTENCE REVIEW

In accordance with 21 O.S.1991, § 701.13(C), we must determine 1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, and 2) whether the evidence supports the jury's finding of aggravating circumstances. Upon review of the record, we cannot say the sentence of death was imposed because the jury was improperly influenced by passion, prejudice or any other arbitrary factor.

Turning to the second inquiry, we note that Charm's jury was instructed on and found the existence of three aggravating circumstances: that the murder was committed to avoid lawful arrest or prosecution; that the murder was especially heinous, atrocious or cruel; and, that Charm constituted a continuing threat to society. Upon our careful review of the record, we find the sentence of death to be factually substantiated and appropriate.

The Judgment and Sentence is **AFFIRMED.**

JOHNSON, P.J., and LUMPKIN, and STRUBHAR, JJ., concur.

LANE, J., dissents.

LANE, Judge, dissenting.

I take exception with the opinion of the majority in a number of ways, one of them fatal to the result of this case. The first disagreement comes with the majority's treatment of the victim impact offering as indicated in footnote 31. I agree that in *Cargle*[1] we *suggested* that the trial court consider the possibility of presenting victim impact material in a question and answer format. However, I now feel that we made a mistake in this regard. As *Cargle* indicated, the admission of this type of information is very limited by the statute as to what is permissible. The nature of the information is emotional and volatile. In a question and answer format the court does not have as much control over limiting the information as it has if the information is imparted by the use of a prepared statement.

The legislature has not helped in telling us what form they intended when they authorized this type of information to be presented in a trial. In a 1992 amendment to § 701.10(C) of title 21 they provided: "In addition, the state may introduce *evidence* about the victim and about the impact of the murder on the family of the victim." (Emphasis supplied) By using the term "evidence" the legislature implied that someone would testify in a question and answer format and be subject to the normal rules as to confrontation. However, the same legislature in the same year enacted § 984 and § 984.1 of title 22 wherein they shunned the use of the term "evidence" and referred to the information authorized as "victim impact *statements*". To me the term "statement" indicates a prepared narrative, not a question and answer form of testimony. This interpretation of the term "statement" is bolstered by other provisions of § 984.1 when it allows the statements to be presented by either the victim or member of the family, either in writing or orally at the hearing, or by a person designated by the victim or family members; and by sub-section C which requires the judge to furnish copies of the statement to the parties.

I would find the question and answer method to be error, but harmless in this case. There was nothing in the testimony that was so grievous that it would have affected the outcome of the sentencing stage of the trial.

---

**58.** *See Johnson v. State,* 911 P.2d at 931; *Hooks v. State,* 902 P.2d 1120, 1125 (Okl.Cr.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1440, 134 L.Ed.2d 561 (1996).

**1.** *Cargle v. State,* 909 P.2d 806 (Okl.Cr.1996).

I also disagree with a part of the majority's treatment of the evidence concerning the aggravator of future dangerousness. I do agree that the determination of the presence of the aggravating circumstance is at the time of sentencing. However, I do not agree that the evidence of the appellant having *consensual sex* with a 14 year old girl is an indication of his propensity for dangerous actions. The act is illegal, immoral, and reprehensible, but it is not a violent act and therefore is not material to proving that Appellant would be a danger to society in the future. Once again, I would find that the error is not outcome determinative and would not reverse on this issue.

The disagreement that I have with the majority that in my opinion dictates reversal arises from the treatment of Appellant's second proposition—the failure to instruct on first degree manslaughter. The majority justifies the failure to give the manslaughter instruction on the rationalization that one of the elements of manslaughter is the lack of a design to effect death and the evidence indicates that such a design was present. This ignores the very heart of the voluntary intoxication defense which is based on the fact that a person can become so intoxicated that he or she cannot form the necessary intent to commit a crime when intent is one of the elements. However, the defense is not a complete defense and a person asserting it would be guilty of a lesser included offense that does not require intent.

This was recognized in *Oxendine v. State,* 335 P.2d 940 (Okl.Cr.1958). Citing *Beshirs v. State,* 14 Okl.Cr. 578, 174 P. 577 (1918); *Choate v. State,* 19 Okl.Cr. 169, 197 P. 1060 (1921); and, *Mott v. State,* 94 Okl.Cr. 145, 232 P.2d 166 (1951); the *Oxendine* court mandated the following instruction found in *Mott* be given when the jury is instructed on voluntary intoxication:

> You are instructed that homicide committed with a design to effect death is not the less murder because the perpetrator was in a state of voluntary intoxication at the time. However, one of the elements of the crime of murder is an intent to effect the death of the person killed and if you find that the defendant at the time of the killing was so completely drunk as to be totally unable to form an intent to kill, or if you have a reasonable doubt thereof, you should not find the defendant guilty of murder. The homicide, under such circumstances, unless otherwise excusable, would amount to manslaughter in the first degree.

*Oxendine,* 335 P.2d at 944. *Oxendine* has been followed in *Williams v. State,* 513 P.2d 335, 339 (Okl.Cr.1973); *Gibson v. State* [2], 501 P.2d 891, 899–900 (Okl.Cr.1972); and, *Biggerstaff v. State,* 491 P.2d 345, 351 (Okl.Cr. 1971).

Contrary to the opinion of the majority, I do not think we can excuse the failure to give the instruction by finding that there was insufficient evidence to require the voluntary intoxication instruction in the first place. That is not the issue. The issue is the Court did give that instruction and, therefor, was required by law to give the follow-up instruction on manslaughter.

The *Oxendine* court summed up my feelings with language that would be appropriate in this case:

> This case has given this court much concern realizing full well the fiendish conception and brutal execution of the crime, the basic facts all being admitted by the defendants. However, the error causing reversal is of such flagrant nature that a precedent approving the same would be extremely detrimental to the rules of evidence by which all people charged with a crime are tried. Regardless of the seriousness of a crime, irrespective of the guilt of a defendant, our system of jurisprudence affords to her or to him a fair and impartial trial in accordance with certain fundamental rules and in conformity with the law. These rules were not adhered to in the case at bar; consequently it must be

**2.** In *Gibson,* the Court, without explanation, found that the failure to give the proper instruction was not sufficient to cause a reversal of the conviction but did cause the punishment to be reduced from death to life imprisonment. 501 P.2d at 900.

retried in compliance with the decisions recited herein.

335 P.2d at 944.